# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES "JIM" CORNETTE,     )     Case No. 3:19-cv-219
     )
    Plaintiff,     )
     )     JUDGE KIM R. GIBSON
    v.     )
     )
BRANDON GRAVER, WILLIAM J.     )
MOLNAR, JR, *individually and d/b/a/*     )
THE INDY CONNECTION, THE INDY     )
CONNECTION, INC., SHOPIFY, INC.,     )
and SHOPIFY (USA), INC.     )
     )
    Defendants.     )

## MEMORANDUM OPINION

## I.  Introduction

James "Jim" Cornette ("Cornette"), a professional wrestling commentator and personality, brought this trademark action against Defendants Brandon Graver ("Graver"), William J. Molnar ("Molnar"), The Indy Connection, Inc. (the "The Indy Connection"), Shopify, Inc. ("Shopify"), and Shopify (USA), Inc. ("Shopify USA").[1] Cornette alleges that G-Raver and the Shopify Defendants have infringed his trademark rights and right of publicity by selling disparaging t-shirts bearing his likeness.  G-Raver moved to dismiss, arguing that the First Amendment precludes Cornette's claims because G-Raver's conduct was parodic and satirical and that its actions are unlikely to cause confusion among consumers.  The Shopify Defendants also moved to dismiss, arguing that this Court lacks personal jurisdiction over Shopify USA and that the Complaint fails

---

[1] The Court will refer to Graver, Molnar, and The Indy Connection collectively as "G-Raver" and Shopify and Shopify USA as the "Shopify Defendants."

to state a claim because Cornette failed to allege that the Shopify Defendants engaged in unlawful conduct. The Motions to Dismiss (ECF Nos. 21, 23, 25) are fully briefed (ECF Nos. 22, 24, 26, 33, 34)) and ripe for disposition.

This Court **DENIES** G-Raver's Motion to Dismiss, **GRANTS** the Shopify Defendants' Motion to Dismiss, **DENIES AS MOOT** Shopify USA's Motion to Dismiss for Lack of Personal Jurisdiction, and holds that Cornette has stated Lanham Act, state trademark, and right of publicity claims against G-Raver, that Cornette has failed to state a claim against the Shopify Defendants, and that whether the Court has personal jurisdiction over Shopify USA is moot.

## II.    Jurisdiction and Venue

This Court has subject-matter jurisdiction over Cornette's Lanham Act claims because they arise under federal law.    28 U.S.C. §§ 1331, 1338.    The Court has supplemental jurisdiction over the remaining state law claims because they form part of the same case or controversy as the federal claims. 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over the state law claims because the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

Shopify USA contests whether this Court has personal jurisdiction;[2] and as jurisdictional issues go to the power of the Court to resolve the issues before it, the Court would ordinarily address Shopify USA's jurisdictional argument first.  However, as the Court concludes that Cornette has failed to state a claim against the Shopify Defendants, it need not consider the jurisdictional issues posed by Shopify USA's Motion.

---

[2] Shopify USA is the only party to contest this Court's personal jurisdiction.

Venue is proper because a substantial part of the events giving rise to this action occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391.

## III.    Factual Background

This lawsuit centers around various personalities in, and types of, professional wrestling. The heart of the case involves the sale by G-Raver through the Shopify Defendants' platform of t-shirts portraying Cornette's likeness in a manner that allegedly interferes with Cornette's trademarks. The Court draws the following facts, which it takes as true for the purpose of deciding these Motion, from Cornette's Amended Complaint. (ECF No. 18).

### A. Cornette and the Wrestling World

Cornette, a Kentucky resident, is a lifelong fan of professional wrestling and has worked in the field since the age of fourteen. (ECF No. 18 ¶¶ 6–8.) Cornette began managing wrestling teams in 1982, and eventually became a wrestling personality on the tv program World Championship Wrestling. (*Id.* ¶¶ 11–12.) Cornette has also owned and operated his own wrestling companies, as well as worked in high-level positions at several other wrestling companies, including World Wrestling Entertainment ("WWE") and the World Wrestling Federation ("WWF"). (*Id.* ¶¶ 13–14.) Cornette has commentated on professional wrestling matches since the early 1990s and is recognized as an expert[3] on the history of professional wrestling. (*Id.* ¶¶ 15–18.) He has also been extensively involved in developing professional wrestling talent. (*Id.* ¶ 19.)

---

[3] The Amended Complaint does not specify who exactly regards Cornette as an expert, but the Court assumes that the Amended Complaint means the professional wrestling fandom.

As a result of his extensive experience in the wrestling arena, Cornette has formed opinions about professional wrestling and has also developed a professional persona. (*Id.* ¶ 20.) Cornette currently hosts two podcasts, "The Jim Cornette Experience" and "Jim Cornette's Drive-Thru," which both focus on wrestling. (*Id.* ¶ 21.) Cornette also has a website, www.jimcornette.com, which offers merchandise including t-shirts, books, and memorabilia, and also has commentary, podcasts and other information related to wrestling. (*Id.* ¶ 22.)

### B. Graver and Deathmatch Wrestling

Graver, a professional wrestler who wrestles under the ring name of "G-Raver," resides in Altoona, Pennsylvania; he began wrestling in 2007. (*Id.* ¶¶ 23–24.) Graver engages in a type of wrestling known as "deathmatch" wrestling. (*Id.* ¶ 25.) In a deathmatch contest, the wrestlers, such as Graver, hit each other with improvised weapons, such as tables, ladders, barbed wire, glass, and fluorescent light tubes; as a result, deathmatch wrestlers are often injured and bloodied by the end of a match. (*Id.*) Cornette has been and is a vocal opponent of deathmatch wrestling. (*Id.*)

### C. Graver and Cornette Argue over Deathmatch Wrestling

On August 31, 2019, a wrestling fan tweeted[4] Cornette a video of a recent deathmatch involving Graver. (*Id.* ¶ 38.) In the video, Graver suffered a serious injury to his arm from a broken fluorescent light tube. (*Id.*) Cornette re-tweeted the video, adding that Graver had taken "a nasty little nick" from the light, and that "if fans were lucky[, the organizers] probably stopped the show so everyone could watch [Graver] bleed out." (*Id.*

---

[4] i.e., used the social media platform Twitter to publicly contact Cornette.

¶ 39.) Graver responded, telling Cornette "let me see you at a convention, I'll spit in your fucking mouth. You've done nothing to me. Now you're an advocate for death?" (*Id.* ¶ 40.) Cornette responded, stating that Graver and his opponent were both "stupid dumb fucks doing something stupid they shouldn't have been doing," and were doing something that "even a blind man could have seen was going to cause serious injury, all to pretend to be 'pro wrestlers' in front of a handful of idiots." (*Id.* ¶ 41.) Graver again replied stating that when Cornette dies "from old age, I'll be there to piss all over you. Can't wait." (*Id.* ¶ 42.)

### D. Graver, Molnar, and The Indy Connection use the Shopify Defendants' Platform to Sell Cornette T-Shirts

Molnar, a Pennsylvania resident, owns and operates The Indy Connection, an e-commerce store that sells merchandise such as t-shirts, key chains, stickers, and other similar items. (*Id.* ¶¶ 26–27.) The Indy Connection is a Pennsylvania non-stock corporation. (*Id.* ¶ 28.) On September 12, 2019, the domain name www.fuckjimcornette.com was registered, and on September 27, 2019, The Indy Connection filed an application for a trademark on the phrase "Fuck Jim Cornette,"[5] to be used for clothing. (*Id.* ¶¶ 29–30.)

Shopify, a Canadian corporation, is an e-commerce platform that permits vendors to set up and manage sales across both virtual and physical stores. (*Id.* ¶¶ 31–32.) Shopify hosts The Indy Connection's e-commerce store. (*Id.* ¶ 33.) Shopify USA, a

---

[5] The Court will use the letters "FJC" to refer to any further instances of the phrase "Fuck Jim Cornette."

5

Delaware corporation, offers marketing services for e-commerce, a service which Molnar and The Indy Connection utilize. (*Id.* ¶¶ 35–37.)

At some point following Cornette's public dispute with Graver, Cornette learned that The Indy Connection was selling a t-shirt with his likeness (the "FJC Shirt"); the t-shirt depicted Cornette's head with tattoo needles protruding from his forehead, his eyes each covered by a bloody "X," and a gag over his mouth. (*Id.* ¶ 43.) The phrase "FJC" was printed around Cornette's face. (*Id.*) Cornette did not grant permission to use his likeness. (*Id.*)

Cornette notified the Shopify Defendants of the unauthorized use of his likeness and they removed the FJC Shirt from The Indy Connection's website. (*Id.* ¶ 44.) At some later point, The Indy Connection offered the FJC Shirt under the description of "Plain Black Tee." (*Id.* ¶ 45.) Cornette again complained and the Shopify Defendants removed the FJC Shirt. (*Id.* ¶ 46.) On October 8, 2019, Graver promoted the FJC Shirt on Twitter by telling his followers to get their "spooky on over at fuckjimcornette.com." (*Id.* ¶ 49.)

Later, The Indy Connection began offering a second shirt (the "MF Shirt"); the MF Shirt was similar to the FJC Shirt in design, using the same image, but instead of "FJC," the text around Cornette's head read "Mother Fucker."[6] (*Id.* ¶ 47.) Cornette did not consent to the use of his likeness for the MF Shirt. (*Id.*) Customers were able to purchase both the MF Shirt and the FJC Shirt via www.fuckjimcornette.com or through The Indy Connection's website. (*Id.* ¶ 48.) After Cornette filed this lawsuit, The Indy Connection offered a third shirt (the "Clownette Shirt"), with a similar image, this one depicting

---

[6] Cornette has not alleged that he complained to Shopify about the MF Shirt.

Cornette in clown makeup, and the word "Clownette."[7]  (*Id.* ¶ 50.)  The Clownette Shirt began shipping on January 16, 2020 and the initial run of shirts sold out.  (*Id.* ¶¶ 50–51.) The base images of both the Clownette and FJC Shirts—Cornette's face—are identical.  (*Id.* ¶¶ 52, 54.)  Cornette alleges that he owns the exclusive license for that image, and he sells a shirt with the same image on his own website.  (*Id.* ¶¶ 52–53.)

### E.  Cornette's Claims Against the Shopify Defendants

Cornette limits his claims against Shopify solely to Count Five, a violation of his right to publicity under Pennsylvania law.  (*See* ECF No. 29.)  Cornette alleges that Shopify is an e-commerce platform that permits independent merchants to create and mange online stores.  (ECF No. 18 ¶ 32.)  Shopify hosts many retail websites, including the shop Molnar and The Indy Connection own.  (*Id.* ¶ 33.)  Shopify USA, Shopify's subsidiary, provides marketing and messaging applications for merchants using Shopify's platform.  (*Id.* ¶¶ 35–36.)  G-Raver uses the services of the Shopify Defendants to operate The Indy Connection.  (*Id.* ¶ 37.)

The Shopify Defendants contracted to, and did, provide The Indy Connection's e-commerce platform and applications for operating it and earned money for these services. (*Id.* ¶¶ 55–56, 91.)

### IV.  Procedural Background

Cornette filed the Complaint on December 19, 2019, bringing several claims relating to misuse of his name and likeness.  (ECF No. 1.)  On February 25, 2020, G-Raver filed a Motion to Dismiss.  (ECF No. 7.)  Two days later, on February 27, 2020, Cornette

---

[7] The Court will refer to the FJC, MF, and Clownette Shirts collectively as the "Shirts."

sought leave from the Court to file a supplemental Complaint, which the Court granted. (ECF Nos. 10, 15.) In granting Cornette's Motion, the Court denied G-Raver's Motion as moot. (ECF No. 15.) Cornette filed the Amended Complaint on March 4, 2020. (ECF No. 18.) The Amended Complaint alleges the following counts: (1) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 1125(a)"); (2) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c) ("Section 1125(c)"); (3) trademark cyberpiracy in violation of the Lanham Act, 15 U.S.C. § 1125(d) ("Section 1125(d)"); (4) common law trademark infringement, unfair competition, and trademark dilution; (5) unauthorized use of likeness in violation of Pennsylvania's Right of Publicity statute, 42 Pa. C.S.A. § 8316 ("Section 8316"); and (6) civil conspiracy. (ECF No. 18 ¶¶ 58–100.) G-Raver filed a second Motion to Dismiss on March 7, 2020. (ECF No. 21.) The Shopify Defendants filed two separate Motions to Dismiss—one for lack of personal jurisdiction over Shopify USA, the other for failure to state a claim—on March 12, 2020. (ECF Nos. 23, 25.) At a status conference on March 17, 2020, Cornette's counsel clarified that Cornette's only claim against the Shopify Defendants was Count Five, for violation of Cornette's right of publicity. (*See* ECF No. 29.)

On February 27, 2020, in conjunction with its request to amend, Cornette filed a Motion for Temporary Restraining Order, asking this Court to enjoin G-Raver and the Shopify Defendants from selling the FJC Shirt, the MF Shirt, and the Clownette Shirt. (ECF No. 11 at 1.) A hearing on that Motion is currently scheduled for April 27, 2020. (ECF No. 16.)

## V.    Legal Standard

The Court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) where the complaint fails "to state a claim upon which relief can be granted." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of what the claims are and the grounds upon which they rest. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[8] *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Id.* Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth.") (citation omitted). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[8] Although *Iqbal* described the process as a "two-pronged approach," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *see id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

for the misconduct alleged." *Id.; see also Connelly*, 809 F.3d at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## VI. Discussion

The Court will begin by addressing Cornette's trademark claims against G-Raver, then turn to his right of publicity claims against the Shopify Defendants and G-Raver, respectively, before concluding with Cornette's civil conspiracy claim.

### A. The Court Denies G-Raver's Motion to Dismiss Cornette's Lanham Act Claims[9]

Cornette brings claims for alleged violations of the Lanham Act, as well as Pennsylvania state law claims. The Court will first address his Lanham Act claims, then turn to his Pennsylvania claims. The Court will address Cornette's claim against the Shopify Defendants separately from his claims against G-Raver.

#### 1. The Parties' Arguments

G-Raver asserts that the First Amendment protects its actions as parody, satire, and expressive conduct and thus bars Cornette's Lanham Act claims. (ECF No. 22 at 12.) Cornette owns no trademark for the name "Jim Cornette," and images and likenesses of a person are not proper subjects of trademarks. (*Id.*) As Cornette has no trademark in his name, and cannot trademark his image, he has no claim for dilution of a trademark. (*Id.*)

---

[9] Pennsylvania's common law causes of action for unfair competition and trademark dilution and infringement are identical to their Lanham Act counterparts, except that there is no requirement of interstate commerce. *Moore Push-Pin Co. v. Moore Bus. Forms, Inc.*, 678 F. Supp. 113, 116 (E.D. Pa. 1987). Accordingly, if G-Raver prevails in its Motion to Dismiss Cornette's Lanham Act claims, it also succeeds in its Motion to Dismiss Cornette's State law trademark claims, as no party disputes the presence of interstate commerce in this case. As the Court concludes that Cornette's Lanham Act claims survive, his state law trademark claims do as well.

G-Raver further contends that the Shirts are parodies of Cornette and a way to express distaste for Cornette's opinions about wrestling. (*Id.* at 13.) The Shirts are commentary that entertains the general public and the First Amendment protects speech that entertains as well as informs. (*Id.* at 13–14.) Finally, although the Shirts include profanity, the First Amendment protects a broad swath of expression, including untraditional forms like profanity. (*Id.* at 14.)

G-Raver maintains that, although it is selling the Shirts for profit, the First Amendment gives its actions the same protection as if the Shirts were not sold for profit. (*Id.* at 14–15.) Although commercial speech receives less protection from the First Amendment than noncommercial speech, the mere fact that an item is sold for profit does not make messages contained in that item commercial speech, especially where the item is a work of comment or criticism. (*Id.* at 15.) As the Shirts are not commercial speech, the Lanham Act does not reach their use of Cornette's name and likeness. (*Id.*)

G-Raver next argues that because Cornette is a celebrity, his opinions and character are free for parody. (*Id.* at 16.) Cornette, by virtue of being a celebrity and wrestling commentator and critic, has opened the door to similar parody and criticism. (*Id.*) To conclude otherwise would be to say that Cornette can permissibly critique wrestlers, but that those critiqued cannot critique him back through parody and satire. (*Id.*) G-Raver's chosen form of responding to Cornette's criticism of deathmatch wrestling was to essentially show what Cornette might have looked like after having engaged in a

deathmatch of his own.[10] (*Id.* at 17.) The Shirts—particularly the Clownette Shirt—are plays on Cornette's character, accusing him of being a clown, something Cornette would be unlikely to say about himself, making it unlikely that anyone in the wrestling community would be unable to identify the Shirts as parodies. (*Id.*) Further, Cornette seeks to restrain criticism of himself, while making his living criticizing others, restricting the communication of ideas and having a chilling effect on future parodies. (*Id.* at 17–18.)

Finally, G-Raver argues that Cornette cannot prove any likelihood of confusion between the Shirts and Cornette's own merchandise because parodies are easily separable from the original. (*Id.* at 18.) Consumers would not see a shirt with Cornette's image, tattoo needles sticking out of his head or shown as a clown and become confused and believe that Cornette endorsed the shirt or be confused as to its parodic content. (*Id.* at 18–19.) Even if there was some likelihood of confusion regarding Cornette's endorsement of the Shirts, where a parodist has a colorable claim that the First Amendment protects using a celebrity's identity in parody, the likelihood of confusion standard is irrelevant because it does not properly weigh First Amendment considerations. (*Id.* at 19–20.) And, even if Cornette has a protectable right in his image or likeness, just using Cornette's image or likeness to communicate a satirical message does not rise to the level of trademark infringement. (*Id.* at 20.)

Cornette responds that G-Raver's arguments are essentially denying his allegations and that G-Raver's defenses are more appropriate for resolution at the

---

[10] G-Raver asserts that the image of a bloodied Cornette is similar to how deathmatch wrestlers are bloodied after a match and that the tattoo needles are Graver's signature weapon while engaging in deathmatches. (ECF No. 22 at 17.)

summary judgment stage because they involve factual determinations. (ECF No. 34 at 8.) Cornette argues that the First Amendment does not apply as a defense because Cornette's image and name distinctively identify him and are therefore protected. (*Id.* at 8–9.) Additionally, the First Amendment does not protect G-Raver's use of Cornette's trademark for commercial gain. (*Id.* at 9–10.)

Cornette's next contention is that G-Raver's sale of the Shirts for commercial advantage brings G-Raver's actions within the scope of the Lanham Act because for-profit sales are commercial rather than noncommercial speech. (*Id.* at 10.) The First Amendment does not protect speech in all circumstances, including where the speech is misleading or concerns unlawful activity. (*Id.*) As the Amended Complaint alleges that the Shirts communicate speech that is both misleading and unlawful, the First Amendment does not protect that speech. (*Id.* at 10–11.)

Cornette asserts that the Shirts cause a likelihood of confusion among consumers and therefore violate the Lanham Act. (*Id.* at 11–12.) Cornette's products and the Shirts are similar, Cornette's mark is strong and recognizable, Cornette's name has a secondary meaning, and a consumer would view the Shirts and Cornette's own products as similar. (*Id.* at 12–14.)

### 2. The Lanham Act

The Lanham Act limits certain business practices that are considered "unfair competition." 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 5:4 (5th ed. 2020). Among these practices that amount to unfair competition are causing confusion to consumers by using false designations of origin for goods, diluting

trademarks through blurring or tarnishing, and cyberpiracy by registering confusing or similar internet domain names in bad faith. 15 U.S.C. §§ 1125(a), (c), (d). Cornette has alleged that G-Raver committed each of these actions in violation of the Lanham Act.

Section 1125(a) bans the use of words, terms, names, symbols, false designations of origin, or false or misleading statements that are "likely to cause confusion" as to the origin, source, or connection of the goods. 15 U.S.C. § 1125(a).

Section 1125(c) entitles the owner of a famous and distinctive mark to an injunction against a person who begins using a mark that is likely to cause dilution by blurring or tarnishing of the famous mark. § 1125(c)(1). A mark is "famous" if the general consuming public of the United States widely recognizes it as identifying the source of the goods or services of the mark's owner. § 1125(c)(2)(A). Dilution by blurring is an association by the consuming public between the famous mark and a similar mark that "impairs the distinctiveness" of the famous mark. § 1125(c)(2)(B). Dilution by tarnishment is harm to the reputation of a famous mark that occurs through its association with the second mark. § 1125(c)(2)(C). Courts apply multi-factor, factually intensive tests to determine whether a mark is "famous," or if dilution has occurred. § 1125(c)(2). However, if the use is "fair," which includes parody or criticism of, or commentary upon, the famous mark or its owner, there is no dilution of the trademark. § 1125(c)(3).

Trademark cyberpiracy is the bad faith registration or use of, or trafficking in, an internet domain name that is confusingly similar to a famous mark. § 1125(d)(1)(A). In determining whether bad faith exists, the Court applies a multi-factor, fact-intensive

inquiry. § 1125(d)(1)(B). If, however, the Court determines that the user believed and had reasonable grounds to so believe that the use of the domain name was fair and lawful, there can be no bad faith. §1125(d)(1)(B)(ii).

Although G-Raver contends that Cornette does not have a trademark in his name or likeness (ECF No. 22 at 12), the Court need not determine whether Cornette does or does not have a trademark in his name at this stage. Cornette has plausibly alleged that he has a famous mark. Cornette has alleged that his name is recognizable throughout the professional wrestling world, including in foreign countries, demonstrating that his name has reach and recognition and that he has been a professional wrestling personality for over three decades, establishing that his name has endured the test of time. (ECF No. 18 ¶¶ 10–19, 61.) Cornette has alleged that he makes significant sales of his merchandise and that his podcast and other content are widely available and that his name is widely recognized by the public. (*Id.* ¶¶ 10–22, 59–61.) Accordingly, although Cornette has not alleged that he has a registered trademark, he has plausibly alleged that his name and likeness are protectable, famous marks.

### 3. G-Raver's First Amendment Arguments Are Premature

G-Raver's primary defense to Cornette's claims is that the First Amendment protects the expression the Shirts embody and shields it from liability under the Lanham Act. (ECF No. 22 at 12–18.) However, a motion to dismiss is not the appropriate stage in the litigation at which to resolve these arguments.

Whether a violation of the Lanham Act has occurred is a question that is "predominantly factual in nature." *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1024 (3d Cir.

2008). For instance, whether there is a likelihood of confusion between a famous mark and the allegedly infringing mark is a question of fact. *Id.* This determination—and others—involves the application of a complex, multi-factor test that requires development and presentation of a factual record.

G-Raver argues that the Shirts are "clearly a parody" of Cornette, and therefore deserving of First Amendment protection. (ECF No. 22 at 12–14, 16–18.) However, whether a particular item is parody, the transformation of something or someone well-known for the purpose of "satirizing, ridiculing, or commenting on" it, is not a determination that is well suited for a motion to dismiss. *Parody*, Black's Law Dictionary, (11th ed. 2019). The allegations contained in the Amended Complaint, as well as images of the Shirts themselves, do not provide this Court with sufficient factual information to make a determination that the Shirts are, as a matter of law, a parody that the First Amendment protects. The Court has no evidence of G-Raver's intent in creating the Shirts, the effect the Shirts have on an audience, or any other relevant facts that would permit the Court to conclude whether the Shirts are parody.[11]

The cases G-Raver cites in support of its First Amendment defense buttress this Court's conclusion. G-Raver relies heavily upon *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003), a case that confronted a similar issue of trademark dilution. Although the *ETW* court ultimately held that the use at issue was noninfringing and that the First Amendment protected the expression, the case was an appeal from a summary judgment decision, not a motion to dismiss. *Id.* at 919. At that stage in the litigation, there was a

---

[11] The Court expresses no opinion on the merits of G-Raver's First Amendment defense, only that now is not the appropriate stage in the litigation to address that defense.

factual record to support the defendants' First Amendment defenses. G-Raver also cites *Cardtoons, L.C. v. Maj. League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996). The *Cardtoons* court held that the First Amendment protected the expression at issue but made that determination on appeal from a grant of judgment following an evidentiary hearing. *Id.* at 964. These cases demonstrate the need for the development of a factual record before conducting an in-depth First Amendment analysis; accordingly, the Court declines to consider G-Raver's First Amendment arguments further at this stage in the litigation.

### 4. Cornette Has Stated a Claim for Unfair Competition by False Designation of Origin in Violation of Section 1125(a)

In determining whether there is a likelihood of confusion based on a false designation of origin of a famous mark, the Court considers the following factors: (1) the similarity between the famous mark and the allegedly infringing mark; (2) the strength of the famous mark; (3) the price of the goods on which the allegedly infringing mark is used and the care expected of customers in making a purchase; (4) the length of time the allegedly infringing mark has been used without evidence of actual confusion; (5) intent of the defendant; (6) evidence of actual confusion; (7) whether the goods are marketed through the same channels or advertised through the same media; (8) the extent to which the target demographics overlap; (9) the relationship between the goods in the minds of consumers; and (10) other factors suggesting that consumers might expect the famous mark owner to have made both goods. *Facenda*, 542 F.3d at 1019.

Based on these factors, Cornette's allegations plausibly establish that there is a likelihood of confusion between his mark and the Shirts. The Amended Complaint

alleges that the FJC Shirt uses both Cornette's name and likeness, and that the MF and Clownette Shirts use his likeness, plausibly establishing similarity as the first factor requires. (ECF No. 18 ¶¶ 43–54.) Further, a cursory examination of the Shirts at issue supports the plausibility of Cornette's allegations of similarity. (*Compare* ECF No. 27-1 at 8–9, *with* *Cornette* *Face* *T-Shirt*, jimcornette.com, https://www.jimcornette.com/store/cornette-face-t-shirt-0 (last visited, Mar. 31, 2020).[12] Cornette has plausibly alleged that his mark is strong, satisfying the second factor. (ECF No. 18 ¶¶ 14–22.) Cornette's allegations also plausibly establish that G-Raver intended to trade on Cornette's name or likeness in selling the Shirts, and that the Shirts are marketed through similar channels, targeted towards similar demographics, and could be related in the minds of consumers, meeting the fifth, seventh, eighth, and ninth factors. (*Id.* ¶¶ 38–54.) Although Cornette's allegations make it difficult for the Court to apply the remaining factors, at this stage, Cornette has plausibly alleged a likelihood of confusion by consumers between his goods and the Shirts. Accordingly, the Court denies G-Raver's Motion to Dismiss Cornette's Section 1125(a) claim.

### 5. Cornette Has Stated a Claim for Trademark Dilution in Violation of Section 1125(c)

In assessing whether dilution by blurring has occurred or will occur, the Court considers: (1) the similarity of the two marks; (2) the distinctiveness of the famous mark; (3) the extent to which the famous mark is being exclusively used by the owner; (4) the extent to which the public recognizes the famous mark; (5) whether the user of the similar

---

[12] The Court may consider these images, although they are not appended to the Amended Complaint because they are integral to, and explicitly relied upon in, the Amended Complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

mark intended to create an association with the famous mark; and (6) actual association of the mark and the famous mark. 15 U.S.C. § 1125(c)(2)(B). Dilution by tarnishment is reputational harm to the famous mark caused by its association with the allegedly infringing mark. § 1125(c)(2)(C).

Here, Cornette's allegations establish plausible claims that the Shirts dilute his trademark by both blurring and tarnishing his mark. Cornette's allegations make out a claim that the use of his name and likeness on the Shirts, as well as their message, may harm the reputation of his mark by associating him with forms of wrestling he finds distasteful or inappropriate. (ECF No. 18 ¶¶ 20, 73–77.)

Cornette's allegations also plausibly establish blurring. Cornette alleges that: (1) the Shirts use his name and likeness, rendering them similar to his mark (*id.* ¶¶ 43–54); (2) his name is distinctive based on his wrestling persona and commentary (*id.* ¶¶ 10–22); (3) his use of the mark, is substantially exclusive (*id.* ¶¶ 21–22); (4) his name and likeness are recognized throughout the United States and in foreign countries (*id.* ¶¶ 21–22, 59–61); and (5) G-Raver intended to associate Cornette with the Shirts (*id.* ¶¶ 43–54). These allegations make out a plausible claim of dilution by blurring of Cornette's mark. Accordingly, the Court denies G-Raver's Motion to Dismiss Cornette's dilution claim.

### 6. Cornette Has Stated a Claim for Trademark Cyberpiracy in Violation of Section 1125(d)

Although G-Raver does not specifically address Cornette' cyberpiracy claim, the Court will briefly address whether Cornette's claim meets the required plausibility standard.

To state a claim for trademark cyberpiracy, Cornette must allege that: (1) G-Raver registered, trafficked in, or used an internet domain name; (2) in bad faith; and (3) the domain name is confusingly similar to, or dilutive of, Cornette's mark. 15 U.S.C. § 1125(d)(1)(A). Cornette has alleged that G-Raver registered a domain name, www.fuckjimcornette.com. (ECF No 18 ¶ 29, 49.) Cornette has alleged bad faith on G-Raver's part (*Id.* ¶¶ 43–54), and a general allegation of malice or intent is sufficient to sustain the bad faith element of a claim on a motion to dismiss. *See* Fed. R. Civ. P. 9(b). Finally, Cornette has alleged sufficient facts to give rise to a plausible inference that www.fuckjimcornette.com is confusingly similar to, or dilutive of,[13] his own website www.jimcornette.com. Accordingly, the Court denies G-Raver's Motion to Dismiss Cornette's Section 1125(d) claim.

### B. The Court Grants the Shopify Defendants' Motion to Dismiss

#### 1. The Parties' Arguments

The Shopify Defendants first argue that Cornette has not pleaded, and cannot plead, any facts establishing that they actually "used" Cornette's likeness for commercial purposes and that the Court must therefore dismiss the claim. (ECF No. 24 at 5.) Cornette has not alleged that the Shopify Defendants sold any of the Shirts or operated any of the websites at issue; in fact, Cornette concedes that the Shopify Defendants had nothing to do with the website and does not allege that they made the Shirts or used Cornette's image. (*Id.* at 6.)

---

[13] In making this determination, this Court incorporates it analysis of Cornette's dilution claim. *See supra* Section VI.A.5.

The Shopify Defendants next assert that the Shirts are creative works that are not used for commercial purposes; as use for a commercial purpose is required to violate Pennsylvania's right of publicity statute, the Shirts do not violate Cornette' right of publicity because Cornette has not alleged that Shopify used Cornette's likeness in connection with its advertising or to promote itself. (*Id.* at 6–7.)

Finally, the Shopify Defendants contend that Cornette's claim fails because they lacked knowledge that G-Raver's use of Cornette's name and likeness was unauthorized. (*Id.* at 7.) The Shopify Defendants only provided the platform through which G-Raver sold the Shirts, along with many other similar websites; it had no control over what the merchants put up for sale through the platform. (*Id.*)

Cornette responds that its pleadings have adequately alleged a right of publicity claim against Shopify. (ECF No. 33 at 5–6.) The Amended Complaint alleged that Shopify used Cornette's likeness for commercial or advertising purposes by hosting the Indy Connection's sale of the Shirts on its platform. (*Id.* at 7–8.) These allegations, that Shopify engaged in the holding out or public use of Cornette's likeness for the purpose of profit, is all that is required for a right of publicity claim in Pennsylvania and Cornette has therefore stated a claim. (*Id.* at 8–9.)

Cornette also argues that Shopify cannot escape liability by saying that the Shirts were "expressive works." (*Id.* at 9.) Although Pennsylvania's right of publicity statute contains an exception that permits the unauthorized use of likenesses in expressive works, that exception only applies when the use is through a "communications medium," which the Shirts are not. (*Id.* at 10.) Further, the Shirts are not "expressive works," and therefore

not subject to immunity. (*Id.*) Even if the Shirts were "expressive works," that determination is fact-intensive and one more appropriately made on summary judgment, not a motion to dismiss. (*Id.*) Finally, the "expressive work" exception only applies when the use is noncommercial, and the Amended Complaint establishes that the Shopify Defendants' use was commercial. (*Id.*)

Cornette's final argument is that the Shopify Defendants' had actual knowledge that G-Raver's use of Cornette's likeness on the Shirts was unauthorized. (*Id.* at 11.) Cornette notified Shopify, on at least two occasions, of G-Raver's sale of the Shirts through the Indy Connection and Shopify removed those postings from The Indy Connection's website. (*Id.* at 11–12.) Despite Shopify removing the postings, sale of the Shirts continued, Shopify permitted those sales, and must be charged with actual knowledge of the unauthorized use of Cornette's likeness. (*Id.* at 12.)

## 2. The Shopify Defendants Did Not "Use" Cornette's Name or Likeness

Section 8316 bars the unauthorized use for commercial or advertising purposes of the name or likeness with commercial value of a person. A "commercial or advertising purpose" is when the name or likeness is used in connection with the sale of a product, to promote or advertise products, or for fundraising purposes. § 8316(e)(1). The term does not include, use of name or likeness on an expressive work, an original work of fine art, or associated with promoting expressive works or works of fine art when used through a "communications medium." § 8316(e)(2). A "communications medium" includes, but is not limited to, newspapers, magazines, books, newsletters, billboards, telephone, radio, television, recordings, computer software, digital communications networks, transit ads,

audiovisual works, and global communications networks. § 8316(e). If the unauthorized use is through a "communications medium," the user cannot be held liable unless he or she had actual knowledge of the unauthorized nature of the use. § 8316(d).

To survive a motion to dismiss, a plaintiff must allege that the defendant "used" his name or likeness for a commercial or advertising purpose. § 8316(a). Shopify and Cornette contest whether the Amended Complaint's allegations sufficiently establish that Shopify "used" Cornette's likeness. Section 8316 does not provide a definition for "use," so the Court must determine its meaning.

In interpreting a statute, this Court starts with the text of the statute. *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 438 (3d Cir. 2018). The Court looks to the plain meaning of the word "use." *Pennsylvania v. Dep't of Health & Human Servs.*, 647 F.3d 506, 511 (3d Cir. 2011). In determining the plain meaning of a word, the starting point is the word's ordinary meaning, and the Court refers to legal and general dictionaries to determine that ordinary meaning. *Id.* "Use" is defined as "to employ for the accomplishment of a purpose; to avail oneself of." *Use*, Black's Law Dictionary (11th ed. 2019). A similar definition is "to put into action or service; to avail oneself of," or to employ. *Use*, Merriam-Webster, https://www.merriam-webster.com/dictionary/use. Availing oneself of is "to make use of" or "to take advantage of." *Avail*, Merriam-Webster, https://www.merriam-webster.com/dictionary/avail. Similarly, to "employ" is to "engage the services of." *Employ*, Merriam-Webster, https://www.merriam-webster.com/dictionary/employ.

These definitions establish that to "use" Cornette's likeness, as defined in Section 8316, the Shopify Defendants must have employed his likeness or made use or taken advantage of it. The Amended Complaint is devoid of any factual allegations that would support even a plausible inference that the Shopify Defendants "used" Cornette's likeness. Cornette's allegations of the Shopify Defendant's actions amount to the following: (1) the Shopify Defendants provide e-commerce services for merchants, hosted G-Raver's store, and provided certain services in connection with hosting the store; (2) Shopify removed several items for sale through its platform that Cornette alleged violated his right of publicity; and (3) in so hosting The Indy Connection's store and taking down offending items, the Shopify Defendants used Cornette's likeness for commercial or advertising purposes in violation of Cornette's right of publicity. (ECF No. 18 ¶¶ 32–37, 44–46, 55–57, 91.) These allegations are insufficient to state a claim that the Shopify Defendants "used" Cornette's likeness in violation of his right of publicity.

Although Cornette contends that he has adequately alleged that the Shopify Defendants used his likeness[14] by providing an e-commerce platform, the allegations do not give rise to a plausible claim that the Shopify Defendants did so. The Amended Complaint does not allege facts that show that the Shopify Defendants employed Cornette's image or took advantage of it. The Amended Complaint does not allege that the Shopify Defendants could control what The Indy Connection sold, except to timely remove items that potentially violated Cornette's rights when notified that The Indy

---

[14] To the extent that Cornette relies on his allegation that the Shopify Defendants "used" his likeness (ECF No. 18 ¶ 91) to establish his claim, this allegation is a legal conclusion that the Court may freely disregard. *See Iqbal*, 556 U.S. at 678–79.

Connection was selling such items. Cornette does not allege that the Shopify Defendants employed his likeness for any purpose. The Amended Complaint lacks any allegations that the Shopify Defendants "used" his name or likeness in any sense of the word. The various definitions of "use" demonstrate that the user must take some sort of action with respect to the likeness at issue, and the Amended Complaint contains no allegations that the Shopify Defendants took any action with Cornette's likeness, other than timely removing the Shirts from The Indy Connection's website upon Cornette's request. Accordingly, the Court grants Shopify's Motion and dismisses Shopify and Shopify USA from the lawsuit.[15]

### C. The Court Denies G-Raver's Motion to Dismiss Cornette's Right of Publicity Claim

#### 1. The Parties' Arguments

G-Raver argues that the Court should dismiss Cornette's state law claims for unauthorized use of name and likeness because the First Amendment also bars the claims. (ECF No. 22 at 21.) In cases of appropriation of likeness, courts balance the interests of the underlying right to free expression against the celebrity plaintiff's interest in protecting his right to control his public image. (*Id.*) Because the Shirts all transform Cornette's likeness by placing it in a different context, the Shirts are transformative and therefore G-Raver's interest in free expression outweighs Cornette's right to control his public image. (*Id.* at 21–22.) G-Raver also argues that any damages Cornette has suffered from the sale

---

[15] As the Court dismisses Cornette's claim against the Shopify Defendants on this ground, it need not consider the Shopify Defendants' remaining arguments.

of the Shirts are nonactionable because the First Amendment bars dilution damages caused by editorial or artistic parodies. (*Id.* at 22.)

Cornette responds that the Shirts use his likeness for commercial advantage, a violation of Pennsylvania's right of publicity statute. (ECF No. 34 at 14.) Cornette's image is valuable, and the unauthorized appropriation of that likeness, such as that embodied in the Shirts, is a violation of his right of publicity. (*Id.*) Cornette has invested time and effort in creating his image and influence in the wrestling world, and it is unlawful for others to use his likeness without his permission. (*Id.* at 15.) Whether the Shirts transform Cornette's likeness is irrelevant because in creating the Shirts, G-Raver necessarily appropriated Cornette's likeness. (*Id.* at 15–16.)

## 2. Cornette Has Plausibly Alleged that G-Raver Violated His Right of Publicity

As noted above, *see supra* Section VI.B.2, Section 8316 provides a cause of action for the unauthorized use, for commercial or advertising purposes, of the name or likeness of a person when that name or likeness has commercial value. 42 Pa. C.S.A. § 8316(a).

The allegations contained in the Amended Complaint are sufficient to state a plausible claim for a violation of Cornette's right of publicity under Section 8316. There are three elements to a Section 8316 claim: (1) that a natural person's name or likeness has commercial value; (2) that the defendant made an unauthorized use of that name or likeness; and (3) that the use is for commercial or advertising purposes. § 8316(a). G-Raver does not dispute that Cornette's name and likeness have commercial value, nor that the use was unauthorized. Cornette's allegations plausibly establish that G-Raver used

his name and likeness for "commercial or advertising purpose" because The Indy Connection began selling the Shirts with Cornette's name and likeness. (*Id.* ¶¶ 43–51.) The use of Cornette's name and likeness "on . . . a product," is sufficient to give rise to liability under Section 8316.

With regard to G-Raver's arguments that the Shirts are "expressive works," and that the First Amendment protects the expression the Shirts contain, as noted above, *see supra* Section VI.A.2, a motion to dismiss is not the proper stage of litigation to resolve that issue. G-Raver relies heavily upon the Third Circuit's decision in *Hart v. Electronic Arts, Inc.,* 717 F.3d 141 (2013), arguing that the First Amendment may serve as a defense to a right of publicity claim. (ECF No. 22 at 21–22.) *Hart* held that courts should balance the interests of the right to free expression against the interest in protecting the right of publicity. 717 F.3d at 149. However, such balancing usually requires a fully developed factual record before analyzing the balance, making a motion for summary judgment, rather than a motion to dismiss, the proper stage in the litigation in which to rule on the defense. *See Hart,* 717 F.3d at 165–170 (reversing a grant of summary judgment for the unauthorized user after consideration of a developed factual record). For instance, the record does not reflect the purpose Graver intended for the Shirts, the potential damages to Cornette's reputation and ability to Control his likeness, the amount to which the image on the Shirts resembles Cornette, and potentially many other different facts that may be necessary to properly assess G-Raver's First Amendment or expressive work defenses—and conducting the balancing of interests inherent in that analysis—to Cornette's claims. The Court declines to consider further, at this time, G-Raver's

argument that the First Amendment bars Cornette's right of publicity claim and denies G-Raver's motion to dismiss that claim.

### D. The Court Denies G-Raver's Motion to Dismiss Cornette's Civil Conspiracy Claim

G-Raver argues that the Court must dismiss Cornette's civil conspiracy claim because, as the First Amendment protects G-Raver's actions, Cornette has no viable claims. (ECF No. 22 at 23.) Because the First Amendment protects its actions, G-Raver has not engaged in unlawful conduct and there can be no conspiracy claim. (*Id.*)

Cornette responds that G-Raver has not actually responded to his conspiracy claims, except to state that if there are no valid claims, there cannot be a conspiracy claim. (ECF No. 34 at 16.) Therefore, if any valid claims remain against G-Raver, the Court should not dismiss the conspiracy claim. (*Id.*)

Pennsylvania law requires that, for a civil conspiracy claim to survive a motion to dismiss, there must be another, underlying, cause of action to sustain it. *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000). As Cornette's Lanham Act claims, state trademark infringement claims, and right of publicity claims survive G-Raver's Motion, Cornette maintains valid underlying claims against G-Raver; accordingly, the Court denies G-Raver's Motion to Dismiss Cornette's civil conspiracy claim.

## VII. Conclusion

For the foregoing reasons, the Court denies G-Raver's Motion to Dismiss, grants the Shopify Defendants' Motion to Dismiss, and denies Shopify USA's Motion to Dismiss for Lack of Personal Jurisdiction as moot.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES "JIM" CORNETTE,　　　　　)　　　Case No. 3:19-219
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)　　　JUDGE KIM R. GIBSON
　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
BRANDON GRAVER, WILLIAM J.　　)
MOLNAR, JR, *individually and d/b/a/*　)
THE INDY CONNECTION, THE INDY　)
CONNECTION, INC., SHOPIFY, INC.,　)
and SHOPIFY (USA), INC.　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　)

## ORDER

**AND NOW**, this ‾2‾n‾d‾ day of April, 2020, upon consideration of Defendants

Brandon Graver, William J. Molnar, Jr., and The Indy Connection, Inc.'s, Motion to

Dismiss for Failure to State a Claim (ECF No. 21), Defendants Shopify, Inc., and Shopify

(USA), Inc.'s, Motion to Dismiss for Failure to State a Claim (ECF No. 23), and Defendant

Shopify (USA), Inc.'s, Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 25), **IT**

**IS HEREBY ORDERED** that Brandon Graver, William J. Molnar, Jr., and The Indy

Connection, Inc.'s, Motion to Dismiss is **DENIED**, Shopify, Inc., and Shopify (USA), Inc.'s,

Motion to Dismiss is **GRANTED**, and Shopify (USA), Inc.'s, Motion to Dismiss for Lack of

Personal Jurisdiction is **DENIED AS MOOT**. **IT IS FURTHER ORDERED THAT**

Cornette's claim against the Shopify Defendants is **DISMISSED**.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE