IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES "JIM" CORNETTE,                )        Case No. 3:19-cv-219
                                     )
            Plaintiff,               )
                                     )        JUDGE KIM R. GIBSON
      v.                             )
                                     )
BRANDON GRAVER, WILLIAM J.           )
MOLNAR, JR, *individually and d/b/a/* )
THE INDY CONNECTION, and THE         )
INDY CONNECTION, INC.                )
                                     )
            Defendants.              )

## MEMORANDUM OPINION

### I.        Introduction

James "Jim" Cornette ("Cornette"), a professional wrestling commentator and

personality, brought this trademark action under the Lanham Act and Pennsylvania state

law against Defendants Brandon Graver ("Graver"), William J. Molnar ("Molnar"), and

The Indy Connection, Inc.[1] (the "The Indy Connection") (collectively, "G-Raver").

Cornette alleges that G-Raver has infringed his trademark rights and right of publicity by

selling disparaging t-shirts bearing his name and likeness (the 'Shirts"). Cornette moved

for a Temporary Restraining Order,[2] asking this Court to enjoin G-Raver from selling and

promoting the Shirts. (ECF No. 11.) Cornette argues that he is entitled to injunctive relief

because he is likely to succeed on the merits of his claim, will suffer irreparable harm in

---

[1] Cornette also brought claims against Shopify, Inc., and Shopify USA, Inc. In a Memorandum Order and Opinion issued on April 2, 2020, the Court dismissed Cornette's claims against Shopify, Inc., and Shopify USA, Inc. (*See* ECF No. 41.)

[2] On February 28, 2020, the Court issued an order stating that it would treat Cornette's request for a temporary restraining order as a request for a preliminary injunction. (ECF No. 16.)

the absence of injunctive relief, and the balance of the equities and public interest favor an injunction. (*see generally id.*) The Motion is fully briefed (ECF Nos. 11, 12, 27, 57, 59) and ripe for disposition.

For the following reasons, the Court **DENIES** Cornette's Motion and holds that: (1) Cornette has failed to establish a likelihood of success on his trademark claims because G-Raver did not engage in commercial speech subject to the Lanham Act; (2) even if G-Raver did engage in commercial speech subject to the Lanham Act, Cornette has not established a likelihood of success on his trademark claims because there is no likelihood of confusion between Cornette's merchandise and the Shirts, Cornette has not shown that his name is sufficiently famous as a mark to be protected from dilution, Cornette has shown no likelihood of dilution, Cornette has failed to show that G-Raver acted in bad faith in registering and using websites that incorporate his name, and because his state trademark claims depend on his Lanham Act claims, has failed to demonstrate a likelihood of success on that claim also; (3) both the First Amendment and Pennsylvania's right of publicity statute protect the Shirts as expressive conduct; (4) Cornette has failed to show that he is likely to suffer irreparable harm in the absence of injunctive relief; (5) the balance of equities disfavors an injunction; and (6) an injunction is not in the public interest.

## II.    Jurisdiction and Venue

This Court has subject-matter jurisdiction over Cornette's Lanham Act claims because they arise under federal law. 28 U.S.C. §§ 1331, 1338. The Court has supplemental jurisdiction over Cornette's remaining state law claims because they form

part of the same case or controversy as his federal claims.  28 U.S.C. § 1367.  This Court

also has subject matter jurisdiction over the state law claims because the parties are

citizens of different states and the amount in controversy exceeds $75,000.  28 U.S.C.

§ 1332.

Venue is proper because a substantial part of the events giving rise to this action

occurred in the Western District of Pennsylvania.  28 U.S.C. § 1391.

III.     **Factual Background[3]**

This lawsuit centers around various personalities in, and types of, professional

wrestling.   The heart of the case involves the sale by G-Raver of the Shirts depicting

Cornette's name and likeness in a manner that allegedly interferes with Cornette's

trademarks and right of publicity.

A. **Cornette and the Wrestling World**

Cornette, a Kentucky resident, is a lifelong fan of professional wrestling who has

worked in the field since he was young.  (Tr. at 124:12–125:8.)  Cornette is a celebrity in

the field of professional wrestling.   (*Id.* at 143:24–144:1.)   Cornette began working in

professional wrestling as a ringside photographer, then began working for wrestling

magazines, and started managing wrestling teams in 1982.  (*Id.* at 123:1–8.)  Cornette also

spent time as a wrestling personality and commentator on the television program World

Championship Wrestling.  (*Id.* at 126:6–13.)  Cornette has also owned and operated his

---

[3] The Court draws the following facts from testimony and evidence presented at the hearing on the
Motion, conducted on May 27, 2020 (ECF No. 56, hereinafter "Tr."), as well as exhibits introduced
at that hearing.  The Court also takes allegations from the Amended Complaint (ECF No. 18) and
affidavits filed by the parties (*see* ECF Nos. 11, 27) for purposes of providing factual context, but
does not rely on those allegations in ruling on Cornette's Motion.

own wrestling companies, and he has worked in high-level positions at several other wrestling companies, including World Wrestling Entertainment, Inc., and the World Wrestling Federation, Inc.. (*Id.* at 125:9–18; 126:14–24; 156:16–25; ECF No. 11-1 ¶¶ 7–8.) Cornette has also been extensively involved in developing professional wrestling talent. (Tr. at 126:14–128:5.)

As a result of his extensive experience in the professional wrestling arena, Cornette has formed opinions about professional wrestling and has also developed a professional persona. (*Id.* at 144:15–20; ECF No. 11-1 ¶¶ 14, 17–18.) Cornette currently hosts two podcasts, "The Jim Cornette Experience" and "Jim Cornette's Drive-Thru," which both focus on wrestling, and Cornette uses these podcasts—along with his Twitter account—to offer opinions on various topics in the world of professional wrestling. (Tr. at 155:3–11; ECF No. 11-1 ¶ 15.) These podcasts follow a format very similar to that of talk radio: fans write to Cornette through email, or contact him via Twitter, and ask him questions or ask for his opinions on certain topics. (Tr. at 143:13–19.) Cornette's Twitter account is a self-described part of his professional "gimmick."[4] (*Id.* at 166:24–167:14.)

Listeners download Cornette's podcasts approximately 1.7 million times per month, and he has approximately 160,000 followers on Twitter. (*Id.* at 134:1–6.) Cornette also has a YouTube channel that provides viewers with videos made from segments cut from his podcast episodes; between 100,000 and 125,000 viewers watch his podcast videos on YouTube each month. (*Id.*) Cornette's YouTube videos are uniquely identifiable from

---

[4] "Gimmick" is a term of art in the professional wrestling community that often refers to a wrestling personality's professional or "in-ring" persona, although it may have more varied or general use in the wrestling community as well. (*See* Tr. at 167:9–21.)

thumbnail images that depict people he discusses in each segment. (*Id.* at 157:23–158:1.) Cornette does not ask for permission from the people his thumbnails depict before he uses each thumbnail. (*Id.* at 158:2–9.)

Recently, Cornette has reduced his work "on-the-road," and focused more on hosting his podcasts, selling merchandise like t-shirts, and operating a website as his primary profession. (*Id.* at 128:6–15.) Cornette sells his merchandise through Cornette's Collectibles, LLC, via his website on www.jimcornette.com, a website designed exclusively for him; these sales ebb and flow throughout the year—they are not consistent year-round. (*Id.* at 128:24–129:2; 140:17–24; 142:11–143:9.) Sales of Cornette's t-shirts in 2019 were approximately $40,000, accounting for approximately 15 percent of revenue from Cornette's merchandise sales. (*Id.* at 128:16–23.) Cornette's t-shirts reflect his particular affinity for "colorful" language and his fans and listeners expect him to utilize such language in his podcasts; for example, Cornette has sold a t-shirt for four or five years with a phrase that Cornette considers to be a catchphrase or personal motto: "Thank you, Fuck you, Bye." (*Id.* at 112:1–13; 129:6–13; 133:17–25.)

As a regular element of Cornette's podcasts and social media presence, Cornette's fans send him wrestling videos where wrestlers "do stupid things," or where something goes wrong in a wrestling move. (*Id.* at 129:19–130:3.) Cornette comments on these videos and the people shown in the videos. (*Id.*) Cornette's comments on one such video gave rise to the dispute at the center of this case. (*Id.* at 84:3–7.)

### B.  Graver and Deathmatch Wrestling

Graver, a professional wrestler and tattoo artist, who wrestles under the ring name[5] of "G-Raver," resides in Lancaster, Pennsylvania; he has been wrestling professionally for 13 years.   (*Id.* at 182:11–15; 220:22–221:1.)   Graver trained as a professional wrestler at Chikara Wrestle Factory in Philadelphia, Pennsylvania and has wrestled at professional wrestling events in the United States, Mexico, and Japan.  (Tr. at 183:2–18; 186:4–187:8.)   For the last five years or so, Graver has engaged in a type of wrestling known as "deathmatch" wrestling.   (*Id.* at 184:13–24; 185:16–18.)   In a deathmatch contest, multiple wrestlers, such as Graver, compete by hitting each other with improvised weapons, such as light tubes, barbed wire, thumbtacks, panes of glass, and weed whackers, among other things; Graver's signature weapons are tattoo needles. (*Id.* at 184:24–185:8; 202:24–203:6.)   As a result of competing with these improvised weapons, deathmatch wrestlers are often injured and bloodied by the end of a match.  (*See id.*)

Cornette is and has been a vocal opponent of deathmatch wrestling because fans of deathmatch wrestling may attempt to replicate the wrestling moves and may suffer serious injury in so doing.  (*Id.* at 155:3–11; 168:21–23.)  Cornette's informal fan club—he refers to it as the "Cult of Cornette"—is a group of people who generally are fans of Cornette, agree with his opinions, and are the targets of Cornette's merchandise

---

[5] A "ring name" is the name a wrestler goes by while performing as a professional wrestler, or while "in the ring."   *See Ring Name*, Wikipedia, https://en.wikipedia.org/wiki/Ring_name (last visited July 7, 2020)

marketing.  (*Id.* at 168:9–23.)  The Cult of Cornette also generally opposes deathmatch wrestling.  (*Id.* at 169:21–24.)

### C.  Graver and Cornette Argue over Deathmatch Wrestling

On August 31, 2019, a wrestling fan tweeted[6] Cornette a video of a recent deathmatch involving Graver.  (ECF No. 11-1 ¶¶ 23–25; Tr. at 168:24–169:2.)  In the video, Graver suffered a serious injury to his arm from a broken fluorescent light tube when the ladder he was on collapsed.  (Tr. at 191:9–192:3.)  Graver lacerated an artery in his arm and nearly bled to death as a result of his injury.  (*Id.* at 191:20–192:3; 195:3–196:22.) Cornette re-tweeted the video of Graver's injury, adding that Graver had taken "a nasty little nick" from the light, and that "if fans were lucky[, the organizers] probably stopped the show so everyone could watch [Graver] bleed out."  (ECF No. 11-1 ¶ 24; Tr. at 198:9– 11.)  Cornette believed that his tweet was self-evidently sarcastic; Graver did not believe so, as he responded, telling Cornette "let me see you at a convention, I'll spit in your fucking mouth. You've done nothing to me. Now you're an advocate for death?"  (Tr. at 198:18–20; ECF No. 11-1 ¶ 25.)  Cornette replied, stating that Graver and his opponent were both "stupid dumb fucks doing something stupid [you] shouldn't have been doing," and were doing something that "even a blind man could have seen was going to cause serious injury, all to pretend to be 'pro wrestlers' in front of a handful of idiots."  (ECF No. 11-1 ¶ 25.)  Graver again responded stating that when Cornette dies "from old age, I'll be there to piss all over you. Can't wait."  (*Id.*)  Graver, angry over Cornette's comments, wanted to "figure out a way" to make a statement to Cornette.  (Tr. at 198:21–199:13.)

---

[6] i.e., used the social media platform Twitter to publicly contact Cornette.

According to Cornette, his response to the video of Graver's injury was part of his regular practice to make fun of "stupid" wrestling moves; Cornette stated that he had no desire for Graver to actually bleed out in the ring. (Tr. at 130:4–14.) After Cornette and Grave had their initial dispute over Twitter, Cornette dubbed Graver "Grover"—a reference to the *Sesame Street* character—created a thumbnail of Graver as Grover for his podcast videos, and used the thumbnail for an animated game of Whack-A-Mole. (*Id.* at 226:17–227:7.)

### D. The Indy Connection, Molnar, and Lombardo

The Indy Connection is a counterculture e-commerce store that sells merchandise such as t-shirts, key chains, dolls, stickers, and other similar items for the wrestling and entertainment industries. (*Id.* at 71:23–72:8; 75:11–19.) Some of these items include profanity as part of their design. (*Id.* at 85:22–86:2.) As a counterculture retailer in the wrestling arena, The Indy Connection sells merchandise for deathmatch wrestlers, as that style of wrestling is outside the mainstream.[7] (*Id.* at 72:12–19.) The Indy Connection mainly relies upon its clients to market their own products; in general, it does not actively promote its products through paid marketing. (*Id.* at 89:25–90:6.) The Indy Connection does, however, use free social media accounts on platforms like Twitter, Instagram, and Facebook to promote its products. (*Id.* at 90:3–91:17.)

---

[7] The Indy Connection also sells merchandise for a counterculture entertainer and stuntman who goes by the name "Superhuman" on his social media profiles. (Tr. at 78:23–79:14.) Like Graver, Cornette has also criticized Superhuman's activities. (*Id.* at 81:8–11.)

Molnar co-owns and co-operates The Indy Connection with Brandon Lombardo.[8] (*Id.* at 67:1–10.)  Molnar is responsible for recruiting new clients for The Indy Connection, as well as fulfillment and procurement, while Lombardo is a graphic designer who maintains the website, uploads merchandise, and occasionally designs merchandise.  (*Id.* at 67:22–25; 76:8–14; 76:15–22; 231:7–9.)   The Indy Connection has several separate "stores" for each wrestler or entertainer whose merchandise they market—one of whom is Graver—so by visiting The Indy Connection's website, a visitor will be aware of the specific entertainer or wrestler who sponsors the merchandise that the visitor sees in a particular store.  (*Id.* at 73:14–20; 74:3–6.)  The Indy Connection has never had a store for Cornette; all merchandise pertaining to Cornette has been sold through Graver's store. (*Id.* at 73:21–74:6.)  When selling merchandise that includes the name or image of people not associated with The Indy Connection, The Indy Connection does not state that that individual endorses or authorizes the products.  (*Id.* at 74:13–17.)

### E.  Molnar Contracts a Graphic Artist to Create Images of Cornette

Lombardo and Molnar, who are friends with Graver, felt that Cornette had acted unprofessionally in criticizing Graver and they wanted to help him out, so The Indy Connection released a benefit t-shirt in support of Graver.  (*Id.* at 83:23–84:14.)   This benefit t-shirt depicted Graver as "unkillable."  (*See* Def. Ex. A.)  The Indy Connection produced the benefit shirt to raise funds for Graver's recovery following his injury.  (Tr. at 110:7–12.)

---

[8] Although Lombardo is a co-owner of The Indy Connection, he is not an individually named defendant in this action.

Graver, as part of his desire to get back at Cornette, came up with an idea to criticize Cornette by creating a t-shirt with Cornette's face on it. (*Id.* at 78:1–5; 201:21–25.) In addition to releasing the benefit t-shirt, Molnar and Lombardo, due to their feelings about Cornette's actions, came on board with this idea; Lombardo testified that this t-shirt was intended to be a "parody" of Cornette.[9] (*Id.* at 84:8–14.)  On September 8, 2019, Molnar contacted Shahin Shaygan, a graphic artist, and asked him to execute Graver's vision for the shirt by making an image of Cornette with his "mouth and eyes crossed out in red and [with] tattoo needles sticking out of his head." (Def. Ex. B; Tr. at 8:2–8.) Shaygan took the base of the image from a still frame of a video of Cornette he found on the internet. (Tr. at 34:2–7.)  The image Shaygan created in response to this request showed a bloodied Cornette with several tattoo needles protruding from his forehead, duct tape over his mouth, and red "Xs" over his eyes. (Pl. Ex. 1; Tr. at 10:15–20; 23:22–24:6.)  Shaygan understood the purpose of this request to be a response to Cornette's criticism of Graver. (Tr. at 24:7–10.)

In addition to the first image, Shaygan also created a second image that depicted Cornette similarly, although Cornette's skin was green; Shaygan referred to this second image as a "zombified" Cornette. (*Id.* at 12:23–13:9.)  Molnar paid Shaygan $60 for his work, although the parties dispute whether the payment was for the first image only, or also the second. (*Id.* at 13:4–17; 78:12–20.)  Shaygan did not believe that the images were

---

[9] There is no documented reference to the word "parody" in the record in relation to G-Raver's actions regarding the creation of this shirt until after litigation began.  However, Lombardo and Graver both testified that they intended to parody Cornette through selling a t-shirt. (Tr. at 84:8–14; 87:2–4; 205:12–18.)

intended to be parodies of Cornette, but did understand that they were caricatures.[10]   (*Id.* at 23:9–21.)  Cornette also described the images as caricatures of himself, although he later stated that he felt that description was inaccurate.  (*Id.* at 151:25–153:9.)  Graver believed that the image was parodic in nature and that that nature spoke for itself.  (*Id.* at 205:15–18.)

### F.   The Indy Connection Modifies Shaygan's Images

After receiving the images from Shaygan, Lombardo took the first image, added hoops around the ends of the tattoo needles to make them more accurate, and placed the image on a t-shirt with the words "Fuck Jim Cornette"[11] around the image (the "FJC Shirt").   (*Id.* at 83:11–17; *see* Pl. Ex. 2.)  According to Lombardo, the purpose of the FJC shirt was to "produce a creative and funny commentary" about Cornette's comments towards Graver following his accident.  (Tr. at 83:18–22.)  The FJC Shirt was intended to critique Cornette's known, public distaste for deathmatch wrestling: Graver suggested tattoo needles stuck in Cornette's head because those needles are Graver's signature weapon in deathmatch wrestling; Xs over Cornette's eyes so that Cornette would not see the deathmatch wrestling he dislikes; and duct tape over Cornette's mouth to muzzle Cornette's vocal criticism of deathmatch wrestling.  (*Id.* at 84:20–85:10.)

---

[10] The parties dispute whether a caricature is considered a parody and vice versa.  (*See* Tr. at 152:20–153:25.)

[11] Graver believes that the message "Fuck Jim Cornette"—or, at least, its meaning—has been used by multiple people to respond to criticism from Cornette for many years.  (Tr. at 208:1–209:2.)

Lombardo also took the "zombified" image, added the letters "STFU!"[12] to the duct tape over Cornette's mouth, and placed it on another t-shirt with the word "Motherfucker" above Cornette's face (the "MF Shirt").  (Tr. at 13:21–23; 14:24–15:10; 70:16–17; *see* Pl. Ex. 3.)  Shaygan did not consent to these modifications, nor to the placement of the images with the words.  (*Id.* at 11:16–12:12; 13:18–23.)  However, on occasion, in order to properly manufacture, print, and sell certain merchandise, The Indy Connection modifies designs artists produce.  (*Id.* at 82:21–83:6.)

As a result of Lombardo's modification of Shaygan's artwork, Shaygan and Molnar had a falling out.  (*Id.* at 18:15–23.)  At some point after Lombardo modified Shaygan's artwork, likely prior to the filing of this lawsuit, Shaygan contacted Cornette and stated that he had not been paid for his work on the images and that he had no desire to be part of any litigation that might arise from the dispute.  (*Id.* at 15:25–16:24; 130:15–131:7.)  Shaygan then executed a contract with Cornette on December 28, 2019, granting Cornette a license to use the images Shaygan had created (the "Cornette License").  (*Id.* at 15:25–16:24; 28:8–20.)  The Cornette License was not an exclusive license and did not give Cornette any copyright rights that Shaygan had in the image.  (*Id.* at 29:2–13.)

At some point after Molnar asked Shaygan to create the images of Cornette, and prior to their falling out, Shaygan's website was taken offline; he believed Cornette was behind it.  (*Id.* at 26:12–24; 27:7–28:1.)  Shaygan then received information from a friend that Cornette's name was not a registered trademark and expressed interest to Molnar to get back at Cornette by registering Cornette's name as a trademark as well as registering

---

[12] "STFU" is a colloquialism, in the form of an initialism, that, in a less-than-polite manner, directs the target of the expression to stop talking.  (*See* Tr. at 14:13–15.)

the web address www.fuckjimcornette.com to redirect to Shaygan's website once he got it up and running again.  (*Id.* at 26:12–24.)

In late December 2019, Lombardo took the image used for the FJC shirt, removed the tattoo needles, duct tape, Xs, and blood, replaced them with clown makeup, stubble, and a prop red, ball nose—depicting Cornette as a clown—and added the word "Clownette" to a third t-shirt (the "Clownette Shirt").  (*Id.* at 68:19–69:5; 16:25–18:11; 86:17–87:4; Pl. Ex. 5.)  Lombardo created the Clownette Shirt because he believed that the dispute between Graver, The Indy Connection, and Cornette was "just so asinine, it had become a circus upon itself, [so] now [it was] just time to bring in the clowns," and because Lombardo believed that Cornette was a clown.  (Tr. at 86:17–87:1; 88:10–13.) Graver was not involved in the creation of the Clownette Shirt and received no money from its sale.  (*Id.* at 97:18–22; 207:2–13.)

### G.  Graver, Molnar, and The Indy Connection Sell the Shirts

On September 12, 2019, Lombardo registered the domain name www.fuckjimcornette.com, and on September 27, 2019, The Indy Connection filed an application for a trademark on the phrase "Fuck Jim Cornette," to be used for clothing; the trademark application was not for use in connection with wrestling personalities, entertainers, podcasters, or other similar uses, areas in which Cornette is active.  (Tr. at 67:11–13; 93:3–23; 95:11–96:2.)  At this time, Cornette did not have a federally-registered trademark on either his name or the phrase "Fuck Jim Cornette."[13]  (*Id.* at 172:24–173:3.)

---

[13] Cornette is currently attempting to trademark his name his name and other phrases he uses on his merchandise.  (Tr. at 174:10–18.)

After the United States Patent and Trademark Office rejected the application, the Indy Connection abandoned its effort to trademark the phrase "Fuck Jim Cornette." (*Id.* at 96:4–13.) Lombardo never approached Cornette or Cornette's counsel with an offer to sell the domain name of www.fuckjimcornette.com, nor did Lombardo intend to register the domain name in an effort to hold it hostage over Cornette. (*Id.* at 93:24–95:7; 175:16–25.) Graver was not involved in the creation or use of www.fuckjimcornette.com to sell the FJC Shirt. (*Id.* at 97:23–25.)

In the middle of September 2019, likely around September 12 or 13, following Cornette's public dispute with Graver, The Indy Connection began selling the FJC Shirt on its website. (*Id.* at 70:18–25; 105:9–13.) The Indy Connection set up www.fuckjimcornette.com to redirect to the page on its website, within Graver's store, where it sold the FJC Shirt. (*Id.*at 70:18–25; 92:23–93:10.) Upon entry to The Indy Connection's website by an internet user through www.fuckjimcornette.com, the URL[14] would change to indicate that the user was now at The Indy Connection's website; The Indy Connection's logo would also appear, as well as a note that the user is in Graver's store. (*Id.* at 93:3–18.)

Through social media—either from his own viewing or through a fan—Cornette learned that The Indy Connection was selling the FJC Shirt; and requested that The Indy Connection's web host, Shopify, remove the FJC Shirt from The Indy Connection's website, which Shopify did. (*Id.* at 105:18–106:1; 141:6–22.) Cornette had not granted The

---

[14] A URL, or "Uniform Resource Locator," colloquially known as a "web address," is a unique identifier for a specific page on a website. For instance, the URL https://www.pawd.uscourts.gov/sites/pawd/files/JG-Practices-Procedures.pdf directs a user to this Court's Practices and Procedures.

Indy Connection permission to use his likeness, and was concerned that The Indy Connection's use of his name and image could set a precedent that anyone who disagreed with him could sell his name and likeness on the internet. (*Id.* at 96:19–22; 132:4–10.) The FJC Shirt was available to the public for only a day or two. (*Id.* at 104:8–9.)

Around September 26, 2020, The Indy Connection again offered the FJC Shirt under the description of "Plain Black Tee;" that is, the image on The Indy Connection was that of a plain black t-shirt, but any purchasers would receive the FJC Shirt. (*Id.* at 115:24–116:2; 221:14–24.) Cornette again complained and Shopify again removed the FJC Shirt. (ECF No. 11-1 ¶ 27.) On October 8, 2019, Graver promoted the FJC Shirt on Twitter by telling his followers to get their "spooky on over at fuckjimcornette.com." (*Id.* ¶ 30.)

In late September or early October 2019, after The Indy Connection began selling the FJC Shirt, Cornette began selling copies of the FJC Shirt on his own website. (*Id.* at 101:7–24; 145:18–24.) Cornette stated that the purpose behind his selling the FJC Shirt was that "if somebody is going to be selling a shirt with my name and face on it, and money is going somewhere, it should come to me and/or a good cause" because he "couldn't really sell it as a serious piece of merchandise." (*Id.* at 131:8–12.) Cornette promoted his version of the FJC Shirt on Twitter and his podcast and stated that a portion of the proceeds would go to charity. (*Id.* at 131:12–18.) Lombardo ordered a copy of the FJC Shirt from Cornette's website and the image on Cornette's version was identical to The Indy Connection's, so far as Lombardo could tell. (*Id.* at 101:7–24.) According to Lombardo, Cornette could not have obtained the image on the FJC Shirt for printing from the internet and must have acquired it in some other manner, as an image taken from The Indy

Connection's website would not have had sufficient quality for t-shirt printing. (*Id.*) Lombardo provided the file for printing only to a third party who printed the FJC Shirts; he never provided it to Cornette. (*Id.* at 102:16–103:22.) Cornette testified that he had asked his t-shirt printers if they could also print the FJC Shirt, and that they were able to do so; he is unaware of how the printers executed this task. (*Id.* at 145:25–146:8.) Cornette's version of the FJC Shirt was available on his website for somewhere between one and two months, and he made some money—"not very much"—from these sales. (*Id.* at 104:18–25; 146:17–21.) Cornette ultimately removed his version of the FJC Shirt due to poor sales. (*Id.* at 147:16–148:4.) Prior to Shaygan's signing of the Cornette License, Cornette had been selling the FJC shirt on his own website since some point in October, a period of nearly two months. (*Id.* at 28:21–29:1.)

In October 2019, either mid-October, or closer to Halloween, The Indy Connection began selling the MF Shirt. (*Id.* at 106:12–20.) The Indy Connection only sold the MF Shirt for a limited period of time, and The Indy Connection voluntarily removed it—Cornette did not ask Shopify to remove it. (*Id.* at 107:9–15.)

On December 31, 2019, approximately two weeks after Cornette filed this action on December 19, 2019, The Indy Connection issued a press release detailing its version of the events leading up to the lawsuit and stating that it had released the FJC Shirt and MF Shirt to depict an "alternative commentary" upon Cornette's dispute with Graver. (Def. Ex. A.)

On January 16, 2020, The Indy Connection began selling the Clownette Shirt. (*Id.* at 68:14–23; ECF No. 11-1 ¶ 32.) Potential purchasers could access the Clownette Shirt

either through The Indy Connection's website, or by entering the web address www.clownette.com.   (*Id.* at 74:7–12.)   If a potential purchaser used the www.clownette.com link, a similar redirection occurred as occurred when using the link www.fuckjimcornette.com: he or she would see text showing that The Indy Connection was selling the Clownette Shirt through Graver's store. (*Id.*)  Graver was not involved in the creation or use of www.clownette.com to sell Clownette Shirts. (*Id.* at 98:1–3.)

The Indy Connection ultimately ended up selling approximately 100 FJC Shirts and a similar number of Clownette Shirts; both shirts were offered for a cost of $24.99. (*Id.* at 70:23–71:8.)  In total, The Indy Connection made approximately $1,500 in profit from sales of the Shirts. (*Id.* at 98:8–24.)  Currently, The Indy Connection is not offering any of the Shirts for sale, although it intended to sell the Shirts at a professional wrestling convention in April 2020 before the convention was cancelled due to concerns over COVID-19.  (*Id.* at 100:7–9; 108:17–109:1.)   However, there are several—at least 32—websites currently offering knockoff versions of the Shirts for sale.  (*Id.* at 107:14–108:4; 178:5–20.)  Cornette is unaware of how these knockoff websites obtained the images on the Shirts. (*Id.* at 179:2–14.)

The Indy Connection did not use any active marketing to promote any of the Shirts, including to fans of Cornette; Graver promoted the Shirts through his various social media profiles.  (*Id.* at 92:1–15; 221:14–223:24.)  Molnar testified that The Indy Connection, in releasing the Shirts, was not marketing the Shirts to Cornette's fans—they were marketed to supporters of deathmatch wrestling—and actively did not want Cornette's fans to purchase the Shirts. (*Id.* at 232:11–12.)

The Indy Connection never received any messages or contacts confusing the Shirts with merchandise Cornette personally endorsed, and there is no evidence of record that anyone was actually confused about either the origin or endorsement status of the Shirts. (*See id.* at 119:10–24.)  Graver also received several messages from Cornette's fans through social media after the Shirts went on sale expressing their distaste for Graver's actions. (*Id.* at 225:5–226:16.)   Cornette, however, believes that the Shirts have "led to so much confusion" about who sells which shirts because "these shirts circulate all over the Internet, nobody knows [who sells them]. They just see the picture, the person, the name. . . . If they know me . . . they could believe [that I'm getting money from their purchase of one of the Shirts.]  (*Id.* at 134:12–135:4.)

Cornette has several streams of revenue which were not affected by sales of the Shirts.  (*Id.* at 136:2–140:2.)  In April 2020, Cornette temporarily suspended merchandise sales through his website so that he could fulfill orders.  (*Id.* at 140:9–16.)  Cornette is unaware of the extent to which sales of his merchandise may have been affected by sales of the Shirts.  (*Id.* at 140:25–141:5.)

## IV.    Procedural Background

Cornette filed the Complaint on December 19, 2019, bringing several claims relating to misuse of his name and likeness.  (ECF No. 1.)  Cornette filed an Amended Complaint on March 4, 2020, alleging the following counts: (1) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 1125(a)"); (2) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c) ("Section 1125(c)"); (3) trademark cyberpiracy in violation of the Lanham Act, 15 U.S.C. § 1125(d) ("Section

1125(d)"); (4) common law trademark infringement, unfair competition, and trademark dilution; (5) unauthorized use of likeness in violation of Pennsylvania's Right of Publicity statute, 42 Pa. C.S.A. § 8316 ("Section 8316"); and (6) civil conspiracy. (ECF No. 18 ¶¶ 58–100.) The Court denied G-Raver's Motion to Dismiss on April 2, 2020. (ECF No. 41.)

On February 27, 2020, Cornette filed a Motion for Temporary Restraining Order, asking this Court to enjoin G-Raver from selling the FJC Shirt, the MF Shirt, and the Clownette Shirt, and any other merchandise bearing Cornette's name or likeness. (ECF No. 58.) A hearing on that Motion occurred on May 27, 2020. (ECF No. 55.) The parties submitted post-hearing briefs to the Court on June 17, 2020. (ECF Nos. 57, 59.)

## V.  Legal Standard

The Federal Rules of Civil Procedure permit courts to issue preliminary injunctions on notice to the adverse party. Fed. R. Civ. P. 65(a). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). A preliminary injunction is appropriate only "upon a clear showing that the [movant] is entitled to such relief." *Id.* at 22 (citation omitted). In determining whether a party is entitled to a preliminary injunction, courts consider four factors: (1) whether the movant has shown a likelihood of success on the merits;[15] (2) whether the movant will be

---

[15] This does not require a showing that it is more likely than not that the party seeking the injunction will ultimately prevail, but the chance must be a "reasonably probability" and "significantly better than negligible." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

irreparably harmed in the absence of the preliminary injunction;[16] (3) whether the balance of equities favors granting a preliminary injunction, including any harm to the nonmoving party; and (4) whether granting the preliminary injunction will be in the public interest. *Id.* at 20; *Revzip, LLC v. McDonnell*, No. 3:19-cv-191, 2019 WL 6701835, at *2 (W.D. Pa. Dec. 9, 2019).

"While these factors structure the inquiry, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements." *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978). Although the Court must balance all four factors, the party seeking the injunction must make a threshold showing of a likelihood of success on the merits and irreparable harm. *Reilly. v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017); *see Nken v. Holder*, 556 U.S. 418, 434–35 (2009).

## VI.     Discussion

### A. Cornette Has Not Shown a Likelihood of Success on the Merits of Any of His Claims

The Court will address whether Cornette has shown a likelihood of success on the merits on his claims starting with his trademark claims and then proceeding to his right of publicity claim.

---

[16] In contrast to the required showing for likelihood of success on the merits, the party seeking the injunction must show that it is more likely than not that it will suffer irreparable harm absent the injunction. *Reilly*, 858 F.3d at 179.

### 1. Cornette Has Failed to Establish a Likelihood of Success on His Lanham Act Claims

Cornette seeks a preliminary injunction on three Lanham Act claims: unfair competition in violation of Section 1125(a), trademark dilution in violation of Section 1125(c), and trademark cyberpiracy in violation of § 1125(d).  (ECF No. 11; ECF No. 18 ¶¶ 58–83.) The Court addresses each in turn.

Section 1125(a) provides a cause of action for trademark holders against persons or entities who use words, terms, names, symbols, devices, or false designations of origin in commerce that are "likely to cause confusion" about the source or endorsement of goods or services.  15 U.S.C. § 1125(a)(1).  Section 1125(c) entitles the owner of a famous and distinctive mark to an injunction against a person or entity whose use of a mark is likely to cause harm to the famous mark through dilution or tarnishment.  15 U.S.C. § 1125(c).  Section 1125(d) provides a cause of action for the owner of a mark against an entity that "registers, traffics in, or uses a domain name" that : (1) is identical or confusingly similar to a distinctive mark at the time the domain name is registered; or (2) is identical or confusingly similar, or dilutive of a famous mark, and does so in bad faith.  15 U.S.C. § 1125(d).

At the outset, the Court notes that Cornette has never owned a federally-registered trademark in his name, the word "Clownette," or the phrase "Fuck Jim Cornette."  (Tr. at 172:24–173:3.)

a.   **Cornette Has Not Demonstrated a Likelihood of Success on the Merits of His Lanham Act Claim for Unfair Competition**

i.   **The Parties' Arguments**

Cornette argues that the Shirts represent unfair competition efforts against him; G-Raver is the alleged undertaker of those actions.   (ECF No. 57 at 10.)   The Lanham Act applies to the Shirts because the message they convey is commercial speech, which the Lanham Act regulates.   (*Id.*)   The Shirts are unfairly competitive because the use of Cornette's name and likeness—valid and legally protectible marks that Cornette owns—is likely to create confusion among consumers about their origin; i.e., that Cornette is the source of, or endorses, the Shirts, rather than G-Raver. (*Id.* at 10–11.)

Cornette asserts that the Shirts are likely to cause confusion under the Lanham Act's test because they cause the same "overall impression when viewed separately" as Cornette's merchandise because Cornette's mark is sufficiently strong and distinctive to merit protection, consumers are unlikely to exercise care in distinguishing the origin of t-shirts, the target market of the Shirts is the same as Cornette's merchandise, and consumers will see the Shirts as related to Cornette's merchandise. (*Id.* at 11–13.)

G-Raver replies that the First Amendment protects the expression embodied within the Shirts, as well as G-Raver's actions taken in connection with selling the Shirts, because that expression is of a parodic or satirical nature.   (ECF No. 59 at 4.)   Because the Lanham Act regulates speech only of a commercial or advertising nature and G-Raver did not engage in commercial or advertising behavior, Cornette has no likelihood of success on the merits because the Lanham Act cannot reach G-Raver's actions. (*Id.*)   G-Raver sold the Shirts in an effort to critique Cornette's views on deathmatch wrestling through

parody; the First Amendment protects this expression, particularly as it regards celebrities like Cornette, because parodies are a valuable means of expression to weaken the ideas the celebrity espouses. (*Id.* at 5–6.) If the Court were to enjoin G-Raver from selling the Shirts, it would prevent anyone from mocking Cornette or his opinions, which is contrary to the First Amendment because the First Amendment prohibits laws that prevent mockery of public figures. (*Id.* at 6.) Such an injunction will cause a substantial chilling of speech related to celebrity parodies and mockery. (*Id.*)

G-Raver argues that the fact that G-Raver did not explicitly use the word "parody" until after litigation began is irrelevant because the Shirts' parodic nature is the same whether G-Raver referred to them as parodies or not. (*Id.* at 6–7.) Graver, Lombardo, and Shaygan each testified that their intention in creating the images for the Shirts was parody. (*Id.*) Further, Cornette's first reaction to the Shirts was that they were caricatures, demonstrating their obvious satirical nature. (*Id.* at 7.)

G-Raver also asserts that there is no likelihood that consumers will be confused as to the origin of the Shirts. (*Id.*) In the case of parody, like this one, there is little likelihood of confusion because the parody is obvious. (*Id.* at 8.) Neither G-Raver nor Cornette ever received any information that there was actual confusion among consumers as to the origin of the Shirts, and fans of Graver and the Indy Connection are not fans of Cornette, reducing the likelihood of overlap between purchasers of the Shirts and Cornette's merchandise. (*Id.*) In fact, G-Raver did not want Cornette's fans to purchase the Shirts, and several of those fans contacted Graver through social media and harassed him for selling the Shirts. (*Id.*)

23

G-Raver maintains that internet users are of increasing sophistication and are perfectly capable of discerning sales of merchandise from authorized websites like www.jimcornette.com from obvious parody sites like www.fuckjimcornette.com or www.clownette.com. (*Id.* at 8–9.) Internet users, upon visiting www.fuckjimcornette.com or www.clownette.com were immediately redirected to The Indy Connection's website and Graver's store, which is identifiably different from Cornette's custom-designed website. (*Id.*) Further, the fact that G-Raver did not utilize paid advertising in promoting the Shirts and did not indicate that Cornette endorsed the Shirts means that the Lanham Act does not cover the conduct, because the Lanham Act addresses truth in advertising, and G-Raver did not advertise the Shirts. (*Id.* at 9.)

### ii. Cornette Has Not Shown that the Creation, Sale, and Promotion of The Shirts Was Commercial Speech

The Lanham Act's purpose is to regulate commerce and provide a right of action for businesses and business owners injured by the use of deceptive or misleading marks in commerce. 15 U.S.C. § 1127. Congress also intended to Lanham Act to protect entities engaged in commerce from unfair competition and to prevent fraudulent or deceptive use of commercial marks. *Id.* The Lanham Act's primary avenue for enforcement is its trademark provisions, but it also creates federal remedies that extend beyond the bounds of trademark law and into the realm of unfair competition. *POM Wonderful, LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). Because the use of marks in commerce can constitute expression, the First Amendment limits the Lanham Act's scope. *See Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1015–16 (3d Cir. 2008)

Courts construe the Lanham Act narrowly to avoid conflicts with the First Amendment. *Facenda* , 542 F.3d at 1016; *see Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 111–12 (6th Cir. 1995). In order to avoid this conflict, the Lanham Act regulates only commercial speech, which receives lesser protection under the First Amendment than more traditional means of expression. *Valley Forge Military Acad. Found. v. Valley Forge Old Guard, Inc.,* 24 F. Supp. 3d 451, 455 (E.D. Pa. 2014); *see Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003); *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Accordingly, the Court must determine whether Cornette has shown that it is likely G-Raver engaged in commercial speech that the Lanham Act may permissibly regulate; if Cornette has not made such a showing, then he has not demonstrated a likelihood of success on the merits of his Lanham Act claims. In determining whether G-Raver engaged in commercial speech, the Court must first consider whether G-Raver engaged in speech at all.

The First Amendment protects the "freedom of speech," but its protections do not stop immediately at the spoken or written word. *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see* U.S. Const. Amend. I. The First Amendment's protections for free speech extend to "expression," which can include conduct. *Johnson*, 491 U.S. at 404. Wearing clothing that expresses certain views is "entitled to comprehensive protection under the First Amendment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969). Particularly relevant to Cornette's claims, wearing clothing that expresses a message in writing, although potentially offensive to some, falls within the First Amendment's protection. *Cohen v. California*, 403 U.S. 15, 26 (1971). Here, the Shirts are conveying a

25

message: G-Raver's opinions of Cornette and his views on deathmatch wrestling.   The Shirts are therefore expression meriting First Amendment protection.

Commercial speech is "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  If the speech: (1) is an advertisement; (2) refers to a specific product or service; and (3) has an economic motivation, then there is "strong support" for the conclusion that the speech is commercial.  *Facenda*, 542 F.3d at 1017.  The Court's analysis is guided by the common sense distinction between "speech proposing a commercial transaction" and other speech. *Id.*

Cornette asserts that all three factors are present in this case because G-Raver is offering products for sale, is advertising those products while referring to specific products, and has an economic motivation for the speech.  (ECF No. 57 at 10.)  The Court disagrees.

The traditional "advertisement" for purposes of commercial speech is a commercial on TV or a notice in a newspaper for a product or sale.  *See Facenda*, 542 F.3d at 1017.  Advertisements also often list the price of the product or service sold and when it may be available.  *See id.*  The Shirts do not easily fit within this general framework, although the Court need not conclusively determine whether the Shirts are advertisements, as it concludes they fall outside the definition of commercial speech because G-Raver lacked an economic motive for selling them.  Because Cornette claims that G-Raver's social media promotions of the Shirts also constitute violations of the Lanham Act, the Court must also consider whether those social media posts are

advertisements.  An "advertisement" is a "commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers." *Advertisement*, Black's Law Dictionary (11th ed. 2019).[17]  Under this definition, Cornette has shown a likelihood that social media postings used to promote the Shirts are advertisements, as they sought to promote the Shirts and attract customers, but Cornette has not shown that the Shirts themselves are advertisements as the Shirts do not seek to attract customers.  For example, Graver promoted the Shirts through his various social media profiles.  (*Id.* at 92:1–15; 221:14–223:24.)

Turning now to whether the speech refers to a certain product or service, the Shirts do not refer to a specific product—they express messages about Cornette and do not refer to products or services—but the social media promotions of the Shirts do refer to a specific product: the Shirts.

The Court next considers whether G-Raver had an economic motivation for selling and promoting the Shirts.  The question of whether G-Raver had an economic motivation for its speech is more than simply a determination of whether G-Raver had an economic incentive to make the speech; to have an economic motivation for purposes of commercial speech, the speaker must speak substantially from economic motivation.  *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983).  Where the first two factors of the Court's

---

[17] Courts assessing whether particular expression constitutes commercial speech rarely analyze what exactly constitutes an "advertisement," *see, e.g., Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 137–38 (3d Cir. 2020), so the Court accordingly turns to dictionary definitions to guide its analysis.  *Cf. United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008).

commercial speech analysis are not conclusive, the motive behind the speech is determinative. *Procter & Gamble*, 242 F.3d at 553. Speech that is primarily motivated by political, religious, or ideological convictions, although it may benefit the speaker economically, may not meet the economic motivation factor, and therefore not be considered commercial speech.[18] *Id.*

Cornette has shown that it is likely that G-Raver had at least some economic incentive for creating, promoting, and selling the Shirts. The Indy Connection made approximately $1,500 in profit from sales of the Shirts; Graver made about $200. (Tr. at 98:8–16; 204:6–8.) However, Cornette has not shown that it was likely the primary, or even a substantial, factor motivating those actions. The initial sale of t-shirts by The Indy Connection was intended to raise funds for Graver's recovery.[19] (Tr. at 110:7–12.) The record is replete with testimony that the Shirts were intended to parody Cornette's views on deathmatch wrestling and to criticize opinions that G-Raver disagreed with. (*See, e.g., id.* at 23:9–21; 83:18–22; 84:20–85:10; 86:17–87:1; 88:10–13.) Promoting the Shirts on social media was a natural method of getting word out about the message the Shirts conveyed; although that motivation may be economic also, Cornette has failed to show that it is

---

[18] The Fifth Circuit provides an excellent example: a woman operates a record store selling Christian rock music and tells her customers that they should buy Christian rock music because other forms of rock music are satanic. *Procter & Gamble*, 242 F.3d at 553 n.28. Whether the Lanham Act applies to her conduct depends on her motivation: if she opened the bookstore because of a sincere religious belief that Christian rock must be made available to combat the evils of other rock music, the speech is likely noncommercial. *Id.* Conversely, if she is agnostic and opened the store after taking a business class that informed her that a properly set up Christian rock store can be very profitable, the speech is likely commercial and therefore subject to the Lanham Act. *Id.*

[19] Although raising funds for Graver's recovery is arguably an economic motivation, Cornette does not claim that the benefit shirt violated his rights in any way, and raising money for a good cause is not a traditional "economic motivation."

likely that G-Raver promoted the Shirts substantially for economic reasons. Although there is no contemporaneous documentary record evidence—except for testimony to the contrary—that The Indy Connection, or anyone associated with creating the Shirts, used the word "parody" prior to the onset of litigation, this lack is not sufficient to show that G-Raver's characterization of the shirts as parodies was a post-hoc rationalization to avoid liability. (*See id.* at 113:18–114:21.) Cornette has not shown that he is likely to succeed in demonstrating that the Shirts and their promotion had the requisite economic motivation to meet the third prong of the commercial speech analysis. Although there is some evidence of economic motivation, and Cornette need not make showings on the merits by a preponderance of the evidence, the clear weight of evidence before this Court demonstrates that G-Raver's motivation for selling and promoting the Shirts was not substantially economic.

Finally, keeping in mind that the distinction between commercial and noncommercial speech is a common sense one, *see Facenda*, 542 F.3d at 1017, the Court holds that Cornette has not shown a likelihood of success on the merits of his unfair competition claim. Based on the evidence of record, a careful and searching review of the images used on the Shirts, and the Court's own common sense, the message G-Raver intended to convey through the Shirts and their promotion is noncommercial in nature. Because Cornette has not shown a likelihood that G-Raver's actions in creating, promoting, and selling the Shirts were commercial speech, and therefore subject to the Lanham Act, he has not shown a likelihood of success on the merits of his Lanham Act claims.

Although the Court holds that Cornette has failed to show a likelihood of success on the merits of his Lanham Act claim because G-Raver's actions did not constitute commercial speech and are therefore not subject to Lanham Act regulation, in the interests of completeness, the Court will proceed to address the merits of Cornette's Lanham Act claims.

### iii. Cornette Has Failed to Show Likelihood of Confusion Between the Shirts and His Merchandise

Section 1125(a) provides a cause of action for trademark holders against persons or entities who, in connection with goods or services, use in commerce "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion . . . as to the origin, sponsorship, or approval" of the goods or services. 15 U.S.C. § 1125(a)(1). To establish a Lanham Act claim of unfair competition, a plaintiff must show the following three elements: (1) a valid and legally protectible mark—here, Cornette's name and likeness; (2) its ownership of the mark; and (3) that the defendant's use of the mark is likely to create confusion about the origin of those goods or services—here, the Shirts and G-Raver's promotions. *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000). If the mark is not federally registered, then whether it is valid depends on whether it possesses secondary meaning, or whether the public views the mark as both an identifier of the goods or services as well as their source. *Id.* at 438. The parties agree that Cornette did not have a federally registered trademark at the time of G-Raver's actions that would include any

actions related to the Shirts, so Cornette's mark is only valid if it has acquired secondary meaning. (Tr. at 172:24–173:3.)

Secondary meaning is an association, in the minds of consumers, between the mark and the provider of the goods advertised using the mark in the mind of consumers. *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 438. For example, the Coca-Cola logo has secondary meaning because consumers associate the logo both with Coca-Cola and see the Coca-Cola Company as the source of Coca-Cola. Factors a court may consider in determining whether the mark has achieved secondary meaning include: (1) extent of sales and advertising that lead to associations by consumers; (2) length of use; (3) exclusivity of use; (4) whether others copy the mark; (5) customer surveys; (6) customer testimony; (7) the mark's use within trade journals; (8) the size of the seller; (9) the amount of sales; (10) the volume of customers; and (11) actual confusion. *Id.*

There is scarce evidence of record related to the secondary meaning factors and the Court cannot conclude definitively that Cornette's mark has achieved secondary meaning. However, the Court will assume, for purposes of resolving Cornette's request for a preliminary injunction based on his unfair competition claim only, that Cornette's name is a valid and legally protectible mark.[20] As there is no dispute that, if there is a valid mark in this case, Cornette owns it, the Court therefore considers whether there is a likelihood of confusion between Cornette's goods and the Shirts.

---

[20] This assumption has no bearing on the Court's determination, detailed below, that Cornette's mark is not "famous" for purposes of Cornette's claim of trademark dilution. *See infra*, Section VI.A.1.b.ii. Whether a mark has achieved secondary meaning and whether it is famous are two separate questions, analyzed under two separate standards.

In assessing whether a likelihood of confusion exists, the Court applies the following factors: (1) the similarity between the plaintiff's mark and the challenged mark;[21] (2) the plaintiff's mark's strength; (3) the price of the goods allegedly infringing and the care expected of consumers in purchasing those goods; (4) the period of time the allegedly infringing mark has been used without evidence of actual confusion; (5) the intent of the defendant; (6) evidence of actual confusion; (7) whether the allegedly infringing goods are marketed through the same channels or advertised through the same media; (8) the overlap of the target demographics; (9) the relationship between the goods, as viewed by consumers; and (10) other factors suggesting that consumers might expect the plaintiff to have made both goods.  *Cornette v. Graver*, No. 3:19-cv-219, 2020 WL 1643370, at *8 (W.D. Pa. Apr. 2, 2020); *see Facenda*, 542 F.3d at 1019.  None of these factors is alone dispositive, and the Court weighs and balances each factor against the others. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).

The first factor, the similarity of the marks, is one of the most critical elements of the Court's analysis.  *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472–73 (3d Cir. 1994).  Marks are similar when they create the same overall impression when viewed separately and are confusingly similar if ordinary consumers would likely conclude that the two products "share a common source, affiliation, connection, or sponsorship."  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 207 (3d Cir. 2000).

---

[21] The Court uses the term "challenged mark" to refer to the allegedly infringing use or conduct by the defendant, whether it is specifically a "mark" or other use.  Here, the term refers to the use of Cornette's name and likeness on the Shirts and promotions of the Shirts.

G-Raver's use of Cornette's name and likeness on the Shirts, or in the website names, is not similar to Cornette's use on his own merchandise and website. Although G-Raver has used Cornette's name and likeness, no consumer is likely to get the same overall impression from either: (1) a t-shirt with Cornette depicted as a clown—and called "Clownette;" or (2) bloodied, gagged, and with tattoo needles in his forehead—with the words "Fuck Jim Cornette surrounding his image—as they would from a t-shirt with Cornette's face or his face and the words "Thank you, Fuck you, Bye." The fact that the word "fuck" appears on both Cornette's shirts and the FJC Shirt is irrelevant because the usage of the word is completely separate: in one, Cornette is telling off his critics, while in the other, G-Raver is expressing his distaste for Cornette. For the same reasons, no consumer would receive the same impression from visiting a website that had either the URL www.fuckjimcornette.com or www.clownette.com as from visiting www.jimcornette.com.

The word "fuck," when used in connection with a person's name, conveys a particularly harsh message, generally meant to offend, and indicating the speaker's contempt, anger, or disgust for the intended recipient. *See Fuck*, Merriam-Webster, https://www.merriam-webster.com/dictionary/fuck. Consumers are unlikely to see a shirt with an image of a bloodied and gagged Cornette that says "Fuck Jim Cornette," or visit a website with the URL www.fuckjimcornette.com and assume that Cornette endorses a t-shirt or website that expresses contempt for himself, or that Cornette is the source of such a website or t-shirt.

Similarly, a clown is "a rude or ill-bred person . . . a fool, jester, or comedian."
*Clown*, Merriam-Webster, https://www.merriam-webster.com/dictionary/clown.   Calling
someone a clown is also a way of expressing contempt for that person, and therefore
consumers are unlikely to believe that Cornette endorsed or originated a website or t-shirt
depicting him as a clown.   Accordingly, the marks at issue in this case, Cornette's name
and likeness on his own merchandise vis-à-vis the Shirts, are not similar.

As to the second factor, the strength of Cornette's mark, the Court considers two
factors: (1) the distinctiveness or conceptual strength of the mark, which looks to the
inherent features of the mark; and (2) the commercial strength and recognition of the
mark, which looks to factual evidence of recognition in the marketplace.  *A&H Sportswear*,
237 F.3d at 221.  Cornette asserts that his mark is strong, but does not address how it is
strong, other than assertions that his name is "synonymous" with wrestling commentary
and   merchandise   because   Cornette   provides   professional   wrestling   fans   with
merchandise, history, memorabilia, commentary, and books.   (ECF No. 57 at 12.)
Cornette has not provided any evidence of record as to the strength of his mark, either
that it is distinct or conceptually strong,  nor has he provided evidence of its recognition
throughout the wrestling world.  Accordingly, Cornette has failed to show that his mark
is strong, and the strength of mark factor favors G-Raver.

The third factor the Court considers is the price of the goods and other factors that
indicate the care consumers exercise in purchasing those goods; for example, conducting
research about a product before buying it.  Confusion is less likely where the goods are
expensive  or  there  is  evidence  that  the  average  buyer  exercises  care  in  making  the

purchase. *Checkpoint Sys.*, 269 F.3d at 284–85. Here, the Shirts were not expensive, as they cost $24.99, although Cornette did not provide evidence of the cost of his similar merchandise, and there is no record evidence that an average buyer exercises care in purchasing items like the Shirts. (Tr. at 70:23–71:8.) Accordingly, this factor favors Cornette.

For factor four, the longer an alleged infringer uses the mark without confusion, the less likely it is that future consumers will be confused. *R.J. Ants, Inc. v. Marinelli Enters., LLC*, 771 F. Supp. 2d 475, 495–96 (E.D. Pa. 2011). As the overlap here is only a few months, and there is no evidence one way or the other of confusion, this factor favors neither party.

The fifth factor the Court considers is the intent of the defendant in adopting the allegedly infringing mark. This inquiry goes to more than just intent to copy, it goes to intent to confuse by copying; a defendant's intent to copy shows a likelihood of confusion only if there is an intent to confuse through "purposeful manipulation" of the allegedly infringing mark to resemble the plaintiff's mark. *A&H Sportswear*, 237 F.3d at 226. Here, there is no evidence that G-Raver intended to use Cornette's name to cause confusion among consumers. The opposite is true: Molnar testified that in creating and marketing the Shirts, the target was deathmatch fans, not Cornette's fans, and The Indy Connection did not want Cornette's fans to purchase the Shirts. (Tr. at 232:11–12.) Cornette has failed to show that G-Raver's intent favors his case, and it therefore weighs against him.

Sixth, there is no evidence as to actual confusion in this case. Cornette brought forth no evidence of consumers who were confused as to the origin of the Shirts vis-à-vis

his merchandise, and rested solely upon his unsupported allegation that the Shirts have "led to so much confusion." (*Id.* at 134:12–135:4.)   Lombardo testified that The Indy Connection never received any communications inquiring as to whether Cornette endorsed the Shirts, and Graver personally received harassing messages related to the Sales of the Shirts, indicating that at least some of Cornette's fans were aware of their origin. (*Id.* at 119:10–24; 225:5–226:16.)  Although Courts are split on how much evidence of actual confusion is necessary to make out a showing on this factor, *see A&H Sportswear*, 237 F.3d at 227, the total absence of evidence of confusion means that this factor weighs in favor of G-Raver.

Seventh, the Court turns to the channels of marketing used for Cornette's goods and the Shirts.  This is generally a fact-intensive inquiry in which the Court must examine how the parties advertise and use their sales forces.  *Checkpoint, Sys.*, 269 F.3d at 289. There is little evidence of record discussing the manner in which the parties market their goods, but the primary vector appears to be social media, whether through direct social media postings like tweets or Instagram posts, or through discussion on a podcast disseminated over the internet and through internet videos. (*See* Tr. at 90:3–91:17, 157:23– 158:1.)  Given the lack of record evidence presented to the Court relevant to this factor, and Cornette's burden to establish a likelihood of success on the merits, it favors G-Raver.

Eighth, the targets of each party's sales efforts favor G-Raver.  In considering this factor, the Court looks to whether the parties desire the same consumers to buy their products. *Checkpoint Sys.*, 269 F.3d at 289.  Although both parties target their merchandise to wrestling fans, the record evidence demonstrates that they each target different sectors

of the professional wrestling fandom. The Indy Connection is a counterculture retailer that caters to wrestling types that are not mainstream, like deathmatch wrestling, and The Indy Connection specifically targeted the Shirts to deathmatch fans, not to the professional wrestling fandom writ large, especially Cornette's fans. (Tr. at 72:12–19; 232:11–12.) Cornette, on the other hand, is a self-described celebrity in the mainstream wrestling community. (*Id.* at 143:24–144:1.) Cornette and his fans, the Cult of Cornette, oppose deathmatch wrestling, and are therefore not the targets of merchandise supporting deathmatch wrestling or criticizing those who criticize deathmatch wrestling. (*Id.* at 155:3–11; 168:9–23; 169:21–24.) The target audiences share some similarities, but they do not overlap, and this factor therefore weighs against Cornette.

Ninth, in assessing the relationship of the products, the Court focuses on the nature of the products and whether it would be reasonable for a consumer to associate them or see them as related. *R.J. Ants*, 771 F. Supp. 2d at 499. For the reasons discussed above in relation to the similarity of the products, the Court holds that the Shirts are not closely related to Cornette's merchandise. Cornette failed to provide evidence that the public views the two as related or synonymous, and although a cursory search for t-shirts related to Cornette might turn up both Cornette's own merchandise and the Shirts, the Court holds that the public would not view the two as related for the reasons previously stated.

Finally, regarding the final factor, other factors suggesting confusion, the parties have not pointed the Court to any other relevant factors to guide its consideration of the likelihood of confusion, so the Court declines to consider any further factors.

Weighing the factors, the Court concludes that Cornette has failed to show a likelihood of confusion between his merchandise and the Shirts. The only factor favoring Cornette is the price of the goods and the care that consumers are expected to use in purchasing items like the Shirts. All other factors either weigh in favor of G-Raver or in favor of neither party. Cornette's showing as to the price of the goods cannot overcome the weight of the factors that favor G-Raver. As Cornette has failed to show a likelihood of confusion, he has accordingly failed to demonstrate a likelihood of success on the merits of his unfair competition claim.

### b. Cornette Has Not Established a Likelihood of Success on His Trademark Dilution Claim

#### i. The Parties' Arguments

Cornette asserts that G-Raver's sale of the Shirts will dilute his trademark because the Shirts will reduce the capacity of his mark to identify his goods. (ECF No. 57 at 14.) Cornette's mark merits protection because his name is famous, G-Raver began making commercial use of his name and likeness after Cornette's mark became famous, and consumers' ability to distinguish Cornette's goods has decreased due to the proliferation of knockoff Shirts. (*Id.*)

In responding to Cornette's trademark dilution claim, G-Raver relies upon previously stated arguments that the Shirts are of a parodic and satirical nature, as well as that consumers are not likely to confuse the Shirts with Cornette's own merchandise. (*See* ECF No. 59 at 4–9.) Therefore, injunctive relief is inappropriate. (*Id.* at 9.)

### ii.   Cornette's Mark Is Not Famous

As discussed above, *see supra* Section VI.A.1.a.ii, Cornette's Lanham Act claim for unfair competition fails because he has failed to show a likelihood that G-Raver engaged in commercial speech. For the same reasons, Cornette has failed to show a likelihood of success on the merits of his Lanham Act trademark dilution claim because the Lanham Act only applies to commercial speech. Accordingly, the Court need not further address the merits of Cornette's trademark dilution claim, but it will do so in the interests of completeness.

Section 1125(c) entitles the owner of a famous and distinctive mark to an injunction against a person or entity who uses a mark, in commerce, that is likely to cause dilution by blurring or tarnishment of the famous mark, regardless of actual or likely confusion. 15 U.S.C. § 1125(c). A mark is "famous" if the general consuming public of the country would "widely recognize[] it as a designation of the goods or services of the mark's owner." § 1125(c)(2)(A). In making this determination, the Court considers "all relevant factors," including: (1) the "duration, extent, and geographic reach" of the mark's advertising and publicity; (2) the "amount, volume, and geographic extent" of sales offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is federally registered. *Id.* This is a "rigorous standard" that extends protection only to "highly distinctive" marks that are "well-known throughout the country." *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007). The parties agree that Cornette did not have a federally registered trademark at any time relevant to this lawsuit, so the Court need not consider that factor further. (Tr. at 172:24–173:3.)

Cornette has presented evidence that he has held a position of some prominence in the world of professional wrestling for nearly 40 years, but the full extent of that prominence and its consistency is not in the record. (*Id.* at 124:23–125:8.) Cornette has an internet following, with 1.7 million podcast downloads and 100,000 to 125,000 YouTube views each month, and 160,000 followers on Twitter. (*Id.* at 134:1–6.) However, he has presented no evidence of the reach of this following, its demographics, how widely recognized throughout the general American public he is, or how his following compares to other professional wrestlers,[22] other wrestling personalities, celebrities generally, or the fame of other "highly distinctive" marks.

Cornette presented some evidence of the extent of his merchandise sales, testifying that in 2019 he sold approximately $40,000 worth of t-shirts; as they account for about 15% of his gross revenue, his merchandise revenue totals around $266,000 per year. (*Id.* at 129:16–23.) Again, however, Cornette has not produced evidence about how this compares to the success of other marks or celebrities, both in the wrestling profession and the world at large.

Third, Cornette presented no evidence, other than that already mentioned, as to the extent of his recognition among the general public. Although G-Raver concedes that Cornette is a celebrity, there are levels of celebrity status,[23] and Cornette provided no evidence from which the Court could conclude that his level of celebrity is such that his

---

[22] For instance, Cornette mentioned the wrestlers John Cena, Brock Lesnar, Randy Orton, and Kane as famous wrestlers; Graver testified that, growing up, he admired the wrestlers Hulk Hogan and Macho Man Randy Savage.

[23] Consider the traditional characterization of hugely famous actors as "A-List" versus their less well-known counterparts on the "B-list" or "C-List."

name is "highly distinctive" and "well-known throughout the country," such that he is widely recognized. Cornette's assertion, unsupported by any evidence of record, that he is "famous," and that therefore his name is a famous mark, cannot overcome this lack of evidence as to the actual extent of his celebrity and recognition. (*See* ECF No. 57 at 14.)

Accordingly, the Court concludes that Cornette has not demonstrated a likelihood of success on the merits of his dilution claim because he does not have a famous mark.

### iii.  Cornette Has Not Shown a Likelihood of Dilution by Blurring

Although the Court has concluded that Cornette has failed to establish a likelihood of success on his trademark dilution claim due both to the noncommercial nature of G-Raver's speech, as well as the fact that Cornette has not shown that his mark is famous, the Court will address Cornette's claim further in the interests of completeness.

In assessing whether a trademark has been diluted by blurring, the Court considers "all relevant factors," including: (1) the similarity between the allegedly infringing marks and the famous mark; (2) the distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark engages in "substantially exclusive use" of the mark; (4) the degree of recognition of the mark; (5) whether the user of the allegedly infringing mark intended to create an association with the famous mark; and (6) an actual association between the two marks. § 1125(c)(2)(B).

The balance of the dilution factors does not favor Cornette. As discussed above, the marks are not similar. *See supra*, Section VI.A.1.a.iii. The Court has also concluded that Cornette's mark is not sufficiently distinctive to be considered famous. *See supra*, Section VI.A.1.b.ii. Cornette has not provided sufficient evidence from which the Court

41

could conclude that he engaged in "substantially exclusive use" of his mark prior to this dispute, but the Court will give him the benefit of the doubt in this instance.  The Court also concluded that Cornette had not shown that his mark was widely recognized.  *See supra, id.*  G-Raver, although intending to reference Cornette in creating the Shirts, had no desire to be associated with him.  (Tr. at 232:11–12.)  Finally, the Court also previously determined that there is no likelihood of an actual association between the two marks.  *See supra*, Section VI.A.1.a.iii.  Accordingly, Cornette has failed to show a likelihood of success on the merits of his dilution by blurring claim.

### iv. Cornette Has not Shown a Likelihood of Dilution by Tarnishment

Dilution by tarnishment is a harm to a famous mark that arises from its similarity to an allegedly infringing mark. 15 U.S.C. § 1125(c)(2)(C).  As the Court has concluded that Cornette has failed to show that the Shirts and his mark are similar, *see supra*, Section VI.A.1.A.iii, the Court concludes that Cornette has failed to show that his mark will be tarnished as a result of any association that may or may not exist between it and the Shirts.

### c. Cornette Has Not Shown a Likelihood of Success on His Trademark Cyberpiracy Claim

### i. The Parties' Arguments

Cornette maintains that G-Raver's registration of the domain names www.fuckjimcornette.com and www.clownette.com constitute trademark cyberpiracy in violation of the Lanham Act because G-Raver registered those domain names with the bad faith intent to profit from their use.  (ECF No. 57 at 15.)  Although G-Raver did not attempt to sell either domain name to Cornette, Cornette is still likely to succeed on his

cyberpiracy claim because Cornette has trademark rights in his name, G-Raver's use of the domain names was commercial and not fair use, G-Raver is seeking both financial gain and to tarnish Cornette's mark by creating a likelihood of confusion as to the origin of the site, and Cornette's name is famous. (*Id.*)

In replying to Cornette's trademark cyberpiracy claim, G-Raver relies upon previously stated arguments that the Shirts are of a parodic and satirical nature, as well as that consumers are not likely to confuse the Shirts with Cornette's own merchandise. (*See* ECF No. 59 at 4–9.) Therefore, injunctive relief is inappropriate. (*Id.* at 9.)

### ii.  G-Raver Did Not Register the Domain Names in Bad Faith

Section 1125(d) provides a cause of action for the owner of a mark against one who has a bad faith intent to profit from that mark and "registers, traffics in, or uses a domain name" that: (1) is identical or confusingly similar to a distinctive mark at the time the domain name is registered; or (2) is identical or confusingly similar, or dilutive of a famous mark.[24] In determining whether a defendant has the requisite bad faith intent, the Court considers all relevant factors, including: (1) the trademark or intellectual property rights of the alleged infringer in the domain name; (2) the extent to which the alleged infringer's legal name is contained in the domain name; (3) prior use of the domain name in connection with "the bona fide offering of any goods or services;" (4) the alleged infringer's legitimate noncommercial or fair use of the mark in a site accessible under the domain name; (5) the alleged infringer's intent to divert customers from the mark's owner

---

[24] Section 1125(d) also provides liability for the use of domain names that relate to the Red Cross or U.S. Olympic Committee, though these causes of action are not relevant to the case at hand.  § 1125(d)(1)(A)(ii)(III); *see* 18 U.S.C. § 706; 36 U.S.C. § 220506.

to a site that might harm the goodwill the mark represents, "either for commercial gain or with the intent to tarnish or disparage the mark" through the creation of a likelihood of confusion as to the source or endorsement of the site; (6) the alleged infringer's intent to hold the domain name hostage or for ransom; (7) the use of false contact information in registering the domain name; (8) the alleged infringer's collection of many domain names which are known to be confusing or similar to marks that are distinctive; and (9) the extent of the mark's distinctiveness under Section 1125(c).  § 1125(d)(1)(B)(i).  Bad faith cannot exist where the Court determines that the alleged infringer "believed and had reasonable grounds to believe" that the use "was a fair use or otherwise lawful."  § 1125(d)(1)(B)(ii).

The record reflects that G-Raver believed that its use of Cornette's name and likeness was a lawful parody.  (Tr. at 23:9–21; 83:18–22; 84:20–85:10; 86:17–87:1; 88:10–13.) Further, as the Court has concluded that the speech in which G-Raver was engaged was noncommercial speech not subject to Lanham Act regulation, G-Raver had "reasonable grounds to believe" that its use of Cornette's name and likeness was lawful.  *See supra*, Section VI.A.1.a.ii.  The Court's conclusion that the Lanham Act would not bar G-Raver's speech even if it was commercial speech subject to regulation further supports this conclusion.  *See supra*, Sections VI.A.1.a.iii, VI.A.1.b.iii, VI.A.1.b.iv.  Accordingly, Cornette has failed to show a likelihood of success on the merits of his cyberpiracy claim.

Although the Court's conclusion that G-Raver believed and had lawful grounds to believe that its use of Cornette's name and likeness was lawful removes the necessity for

the Court to apply the bad faith factors, in the interests of completeness, it will consider those enumerated factors.

The Court concludes that Cornette has failed to establish a likelihood that he will be able to show that G-Raver acted in bad faith. G-Raver has no trademark or other intellectual property rights in either www.fuckjimcornette.com or www.clownette.com, nor does the legal name of any of the G-Raver parties appear in either domain name, so the first two factors favor Cornette. G-Raver has also never offered goods or services other than the Shirts through either website, again favoring Cornette. However, as noted above, G-Raver's use was also noncommercial, a factor that weighs against Cornette. There is no evidence in the record that G-Raver intended to divert consumers from Cornette's website to The Indy Connection's to create a likelihood of confusion, again weighing against Cornette—Molnar testified that G-Raver did not want Cornette's fans to buy the Shirts. (Tr. at 232:11–12.) G-Raver also never attempted to hold either domain name hostage or for ransom over Cornette, also weighing against Cornette. (*Id.* at 93:24–95:7; 175:16–25.) There is no evidence of record that Lombardo or The Indy Connection provided false information in registering either domain name; the factor therefore weighs against Cornette. There is also no evidence of record that G-Raver registered multiple domain names that it knew were identical or confusingly similar to Cornette's name; this factor, too, weighs against Cornette. Finally, as the Court was unable to conclusively determine whether Cornette's mark is famous as Section 1125(c) defines that term, *see supra* Section VI.A.1.b.ii, this factor therefore weighs against Cornette as he carries the burden to show the fame of his mark to entitle him to a preliminary injunction.

Weighing the bad faith factors, the Court concludes that Cornette has not made a sufficient showing that G-Raver engaged in bad faith.   Accordingly, Cornette has not demonstrated a likelihood of success on the merits of his cyberpiracy claim.

**2.   Cornette Has Not Shown A Likelihood of Success on the Merits of His Common Law Trademark Claims**

Cornette contends that, because Pennsylvania's common law cause of action for unfair competition is identical to that of the Lanham Act's, with the exception of a requirement that there be interstate commerce, if the Court finds a likelihood of success on the merits of Cornette's Lanham Act claims, it must find a likelihood of success on Cornette's common law claims.  (ECF No. 57 at 16.)  Conversely, if the Court does not find a likelihood of success on the merits of Cornette's Lanham Act claims, there is no likelihood of success on the merits of his common law claim.  (*See id.*)  The Court agrees that the causes of action are the same.  *See Moore Push-Pin Co. v. Moore Bus. Forms, Inc.*, 678 F. Supp. 113, 116 (E.D. Pa. 1987).

Having concluded that Cornette has failed to show a likelihood of success on any of his three Lanham Act claims, *see supra* Section VI.A.1, the Court holds that Cornette has likewise failed to show a likelihood of success on his common law trademark claims.

3.   **Cornette has Not Shown a Likelihood of Success on the Merits of His Right of Publicity Claim**[25]

a.   **The Parties' Arguments**

Cornette asserts that the Shirts also violate his statutory right of publicity because they are an unauthorized use of his name and likeness for a commercial purpose.  (ECF No. 57 at 16.)  The Shirts portray Cornette in a recognizable manner, and Cornette's name has commercial value because he has developed it with time, money, and effort.  (*Id.*)  The Shirts are a commercial use because they use Cornette's name and likeness in connection with selling or advertising a product without his permission.  (*Id.* at 16–17.)

G-Raver reiterates the previously stated arguments that the First Amendment protects use of Cornette's name and likeness on the Shirts in relation to Cornette's right of publicity claim, and also that the use was not in a commercial or advertising manner as the statute requires.  (*See* ECF No. 59 at 4–9.)  Therefore, injunctive relief is inappropriate.

b.   **The Shirts Are Expressive Works under the First Amendment and Section 8316**

Section 8316 bars the unauthorized use of the name or likeness of a person for commercial or advertising purposes when that name or likeness has commercial value.  42 Pa. Cons. Stat. § 8316(a).  "Commercial value" is a "[v]aluable interest" in a person's name or likeness that "is developed through the investment of time, effort, and money."  § 8316(e). A "commercial or advertising purpose" is the public use of a person's name or likeness "on or in connection with" selling or offering a product for sale, to promote or

---

[25] The Court confines its analysis of Cornette's right of publicity claim solely to the Shirts and not to any promotions thereof.  Cornette has not argued that any of G-Raver's promotions violated his right of publicity, and the Court finds no evidence in the record to support such a claim even if made.

advertise products, or for fundraising.  § 8316(e)(1).  However, if the use is through a "communications medium," it is not a violation when: (1) the person appears as a member of the public and is not named or identified; (2) the use is associated with a news report; (3) the use is an expressive work; (4) the use is an original work of fine art; (5) the use is associated with announcing or promoting a news report, expressive work, or work of fine art; or (6) the use is associated with identifying the person as the creator of a work. § 8316(e)(2).  A "communications medium" includes, but is not limited to, newspapers, magazines, books, billboards, telephone, radio and television broadcasts, digital communications networks, audiovisual works, and global communications networks.  § 8316(e).

G-Raver does not dispute that it used Cornette's name and likeness without his permission.  The issues the Court must confront are whether Cornette's name has commercial value, whether G-Raver's use was for a commercial or advertising purpose, and whether the Shirts are a "communications medium."

The typical claimant under § 8316 has invested resources to develop a personal brand and is suing a person or entity who is exploiting that brand without permission. *Taha v. Bucks Cty.*, 9 F. Supp. 3d 490, 493 (E.D. Pa. 2014).  For example, a chef had a valid claim against a former employer who continued to use his name to promote wedding catering packages when the chef had extensively detailed his efforts at building a reputation in the catering industry.  *Lewis v. Marriott Int'l, Inc.*, 527 F. Supp. 2d 422, 428 (E.D. Pa. 2007).

Here, Cornette has presented sufficient evidence to demonstrate a likelihood that he will be able to show that his name has commercial value. Cornette has been involved in professional wrestling for nearly 40 years and is a celebrity in the field. (Tr. at 123:1–8; 142:24–144:1.) Cornette hosts two podcasts that are downloaded approximately 1.7 million times per month, has 160,000 followers on Twitter, and receives between 100,000 and 125,000 views per month on his YouTube channel. (*Id.* at 134:1–6.) Cornette sells merchandise with his name on it through his website, and his t-shirt sales revenue, which accounts for approximately 15 percent of his annual merchandise revenue was approximately $40,000 in 2019. (*Id.* at 112:1–13; 128:16–23; 129:6–13; 133:17–25.) The time, energy, and effort required to establish this presence are sufficient to show likelihood of success in establishing the commercial value of Cornette's name.

Next, the Court turns to whether G-Raver's use was for "commercial or advertising purposes" as Section 8316 defines that phrase. Section 8316 limits a commercial or advertising purpose to use for fundraising, for advertising or promoting products, or "on or in connection" with selling or offering to sell products. 42 Pa. Cons. Stat. § 8316(e)(1). G-Raver did not use Cornette's name and likeness for fundraising[26] and the record does not demonstrate the G-Raver used Cornette's name and likeness to promote products; rather, variations of Cornette's name and likeness essentially were the product. However, Cornette's name and likeness both appear on the Shirts, which are a product, and G-Raver's use facially falls under Section 8316's scope because Cornette's name and likeness are "on . . a product." (*See* Pl. Ex. 1–5; Tr. at 8:17–24; 67:14–19; 69:17–

---

[26] Although The Indy Connection did release a benefit t-shirt to raise money for Graver's health care, Cornette does not claim that that shirt violated his right of publicity.

70:17.)   However, there are exceptions to Section 8316's coverage, even when the use is facially for a commercial or advertising purpose; the relevant exception here is if the Shirts are expressive works and the use is through a communications medium.   42 Pa. Cons. Stat. § 8316(e)(2).   Section 8316 defines an "expressive work" as a "literary, dramatic, fictional, historical, audiovisual, or musical work regardless of the communications medium by which it is exhibited, displayed, performed, or transmitted, other than when used for a commercial or advertising purpose."  § 8316(e).

Although t-shirts are not explicitly listed as an "expressive work," the Court holds that, on the evidence presented, the Shirts fall within § 8316's definition of the term.  A "work" is "something produced or accomplished by effort, exertion, or exercise of skill," or "something produced by the exercise of creative talent or expenditure of creative effort."   *Work*,  Merriam-Webster,  https://www.merriam-webster.com/dictionary/work. The Shirts, and the images used in their creation, are "works" under this definition.  The Shirts were "accomplished by effort, exertion, or exercise of skill," primarily through Shaygan and Lombardo's work creating the images and then placing those images on the Shirts.  (Tr. at 10:15–20; 23:22–24:6; 83:11–17.)

The shirts are also expressive.  "Expressive" means "serving to express, utter, or represent," or "effectively conveying meaning or feeling."  *Expressive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/expressive.  "Express," similarly, means to "represent in words," or "make known the opinions or feelings of" the speaker.  *Express*, Merriam-Webster,  https://www.merriam-webster.com/dictionary/express.   The Shirts serve to "express, utter, or represent" G-Raver's "opinions or feeling" about Cornette and

50

his views on deathmatch wrestling; this expression is both explicit—"Fuck Jim Cornette" and "Clownette"—and implicit—through the depiction of Cornette as bloodied and gagged and as a clown.

Although at first glance, the Shirts, despite fitting the dictionary definitions for "expressive works," do not fall under the explicitly listed media of expressive works— "literary, dramatic, fictional, historical, audiovisual, or musical" works—on closer inspection, the Shirts are properly considered fictional expressive works.[27] "Fictional" works are those "of, relating to, characterized by, or occurring in fiction; invented by the imagination." *Fictional*, Merriam-Webster, https://www.merriam-webster.com/dictionary/fictional. "Fiction," in turn, is "something invented by the imagination." The image of a bloodied and gagged Cornette, with tattoo needles sticking out of his forehead was "invented by [Graver's] imagination" as a way to get back at Cornette for his comments about Graver. (Tr. at 8:2–8; 78:1–5; 201:21–25.) In the same vein, Lombardo's vision of Cornette as a clown was "invented by [his] imagination." (Tr. at 86:17–87:1; 88:10–13.) The Court holds that, on the record before it, Cornette has failed to establish a likelihood that he will be able to show that the Shirts are not fictional "expressive works."

Finally, the Court considers whether the Shirts are a "communications medium." Although a t-shirt is not included in enumerated communications media that Section 8316 specifically exempts, the Court concludes that the Shirts are a "communications medium"

---

[27] Although "audiovisual" works might, at a glance appear a category under which the Shirts might fall, an "audiovisual work" consists of "related images that presented in series . . . and accompanied by sound." *Audiovisual Work*, Black's Law Dictionary (11th ed. 2019). The Shirts, being single images and lacking sound, do not fit this definition.

as Section 8316 defines the term.  Section 8316's exemption for "expressive work[s]" demonstrates that Section 8316 contemplates exceptions from liability for right of publicity violations when the use of the plaintiff's name or likeness communicates a message.  Clothing is often used to convey a message, such as when protesting government policy, and the First Amendment protects this expression.  *E.g.*, *Cohen*, 403 U.S. 15; *Tinker*, 393 U.S. 503.  In *Cohen*, the Supreme Court held that the First Amendment permitted a person to wear a jacket with the phrase "Fuck the Draft" in public, 403 U.S. at 26, and in *Tinker*, the Supreme Court held that wearing black armbands protesting the Vietnam War was expressive conduct that the First Amendment protected.  393 U.S. at 514.

In both *Cohen* and *Tinker*, the clothing worn was the medium through which the message was communicated—in other words, the jacket and the armband, respectively, were "communications mediums."  The types of media Section 8316 specifically exempts bolster this conclusion.  Section 8316 exempts billboards and transit ads, radio and television broadcasts, and newspapers and magazines, among others.  § 8316(e)(2).  It would be nonsensical that t-shirts that communicate a message are not included in this list, because then, had G-Raver taken out a full-page advertisement in a newspaper with the images used for any of the Shirts, they would not have violated Cornette's right of publicity, but the use of t-shirts would be prohibited.  For these reasons, the Court concludes that t-shirts are a "communications medium" as defined in Section 8316.

Although the Court concludes that the Shirts are expressive works within Section 8316's definition, as the First Amendment places limitations on the right of publicity even

The Transformative Use Test's primary inquiry is to ask whether the new work adds something new, with additional purpose or character, changing the original with new meaning or expression, or just supersedes the old work; in essence, the question is whether the new work is "transformative" of the old. *Id.* at 159 (citing *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 808 (Cal. 2001)).  Transformative elements may include, in certain circumstances, "factual reporting, fictionalized portrayal, heavy-handed lampooning, and subtle social criticism." *Id.*

When a new work is transformative of the old, it is significantly less likely to interfere with the economic interests the right of publicity protects.  *Id.*  In particular, works parodying celebrities are not, from the point of view of a fan of the celebrity, an appropriate substitute for the celebrity's authorized goods and therefore do not particularly impact the celebrity's market. *Id.*

The ultimate question that the Transformative Use Test asks is whether the celebrity's likeness is "so transformed" as to become more the defendant's own expression rather than the celebrity's likeness; if the celebrity's likeness is part of the "raw material" from which an original work is synthesized, rather than being the "very sum and substance" of the work, the work is transformative.  *Id.* at 160. If the use is transformative, the First Amendment protects the use from liability for violating the right of publicity. *See id.*

The Court concludes that Cornette has failed to establish a likelihood that he will be able to demonstrate that the Shirts are not transformative; accordingly, the Court holds that, for purposes of Cornette's request for a preliminary injunction, the Shirts are

protected expression.  The parties agree that it is Cornette's likeness on the Shirts, as well as his name.  (Tr. at 69:21–70:17.)  However, Cornette's likeness is not the "very sum and substance" of any of the Shirts. The "sum and substance" of the Shirts is G-Raver's criticism of Cornette—whether, in G-Raver's view, Cornette's views on deathmatch wrestling are wrong, he is a contemptible figure, or he is a clown.  (Tr. at 84:20–85:10; 86:17–87:1; 88:10–13.)  The Shirts do not simply supersede a shirt with Cornette's face on it, or his "Thank you, Fuck you, Bye" t-shirts; a t-shirt with Cornette bloodied and gagged, or depicted as a clown, is a poor substitute for Cornette's authorized merchandise that depicts Cornette in a positive light and is unlikely to be worn by a member of the Cult of Cornette.  In sum, the Court concludes, based on the record before it, that the Shirts are transformative and therefore protected First Amendment expression.

For the foregoing reasons, Cornette has failed to establish a likelihood of success on the merits of his right of publicity claim.

### 4. Cornette Does Not Seek a Preliminary Injunction on His Civil Conspiracy Claim

Cornette advances no argument as to why he is likely to succeed on the merits of his civil conspiracy claim, and the Court therefore assumes that he is not attempting to secure a preliminary injunction on the basis of that claim.[31]  G-Raver also argues that Cornette cannot obtain a preliminary injunction on this claim because all other claims must fail.  (ECF No. 59 at 9.)  As Cornette does not appear to be seeking injunctive relief

---

[31] Whether an injunction is a proper remedy for a civil conspiracy claim is not before the Court and the Court therefore expresses no opinion on the issue.

on his civil conspiracy claim, the Court will not further consider Cornette's civil conspiracy claim as a basis for granting a preliminary injunction.

**B. Cornette Has Failed to Show that He Will Suffer Irreparable Harm in the Absence of an Injunction**

### 1. The Parties' Arguments

Cornette argues that he will suffer irreparable harm in the absence of an injunction because if this Court does not enjoin G-Raver's conduct, that refusal will set a precedent that any person can copy Cornette's merchandise or intellectual property for their own benefit. (ECF No. 57 at 18.) Permitting G-Raver to continue selling the Shirts will deprive Cornette of the benefit of his effort developing his trademark, and co-infringers are also profiting from his effort, both from selling knockoffs of the Shirts, but also of Cornette's own merchandise. (*Id.*) This conduct results in dilution of Cornette's trademark and a preliminary injunction will remedy this harm. (*Id.*)

G-Raver responds that Cornette has not shown that he will suffer irreparable harm and that his argument rests solely upon his assertion that he will suffer such harm. (ECF No. 59 at 10.) In Lanham Act cases, there is no presumption of an injunction, and the party seeking the injunction must clearly show irreparable harm, which Cornette has failed to do. (*Id.*) Cornette was unable to identify any harm he has suffered as a result of G-Raver's actions, and has, in fact, had to shut down his business temporarily so that he could fulfill all merchandise orders. (*Id.*)

### 2. Cornette's Harm Is Not Irreparable

A plaintiff must make a clear showing that he or she is likely to suffer irreparable harm in the absence of an injunction. *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d

205, 217 (3d Cir. 2014).  In Lanham Act cases, there is no presumption of irreparable harm, as this is inconsistent with the plaintiff's burden to show such harm.  *Id.* at 216–17  For the same reason, the Court does not presume irreparable harm on right of publicity claims. *See id.*  Accordingly, Cornette has the burden to show that he is likely to suffer irreparable harm if the Court does not enjoin G-Raver from selling and promoting the Shirts.

The risk of irreparable harm cannot be speculative, it must be based on concrete evidence.  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000).  Nor can a plaintiff establish irreparable harm on the basis of "bald and conclusory statements." *Brown v. Beard*, No. 8-cv-26, 2008 WL 11344639, at *2 (W.D. Pa. Mar. 5 2008).

Cornette has failed to show a likelihood of irreparable harm.  Although harm to his reputation may be a basis for irreparable harm, *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990), he still bears the burden of demonstrating that irreparable harm is likely, and he has not carried that burden. Further, economic harms, such as reduced sales, are not irreparable.  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).

Cornette asserts that if the Court fails to enjoin G-Raver's conduct, any person can sell his name and likeness on merchandise across the web.  (ECF No. 57 at 18.)  However, as the Court has extensively discussed, *see supra* Sections VI.A.1.a.ii, VI.A.3.b, any person can take his name and likeness and sell it on the internet and remain free from liability so long as those actions fall within the First Amendment's protections.  Any harm caused to Cornette's brand through parodies or satires that fall within the First Amendment are not harms the legal system can address—for example, "when a lethal parody, like a scathing

theater review, kills demand for the original, it does not produce a cognizable harm." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).[32]   Cornette has produced no evidence, other than his own "bald and conclusory statements," that he will suffer irreparable harm in the absence of an injunction.   There is no expert testimony describing how these parodies will affect his reputation, and no evidence that the sale of the Shirts has affected his reputation; Cornette's business operations do not appear to have suffered as a result, and although economic losses are reparable, the Court considers the lack of harm to his business as illustrative of the fact that Cornette has not shown irreparable harm.   (*see* Tr. at 140:9–16.)   Accordingly, Cornette has failed to show that he is likely to suffer irreparable harm in the absence of a preliminary injunction.

### C.   The Balance of the Equities Weighs Against an Injunction

The Court need not consider the remaining two preliminary injunction factors, as Cornette has failed to make a showing on either the likelihood of success on the merits or irreparable harm.   *See Reilly*, 858 F.3d at 176.   However, the Court will proceed to do so in the interests of completeness.

#### 1.   The Parties' Arguments

Cornette argues that the balance of the equities favors the issuance of a preliminary injunction and that G-Raver cannot object to an injunction because G-Raver brought the request for an injunction down on itself by continuing to sell and promote the Shirts.   (ECF No. 57 at 19.)   Cornette made repeated requests that G-Raver cease and desist

---

[32] Although *Campbell* was a copyright case, rather than a trademark or right of publicity case, many of the principles from copyright law carry over into legal analysis of the right of publicity.   *See supra*, Section VI.A.3.b.

from using his name or likeness, attempting to register Cornette's name as a trademark, and using Cornette's name in a website's domain name. (*Id.*) G-Raver did not need to use Cornette's name or likeness to operate its business and should have known that it was acting in violation of Cornette's rights. (*Id.*) G-Raver will suffer no harm if the Court issues an injunction because it will have no effect on business and the injunction will protect Cornette from further damages. (*Id.*)

G-Raver replies that Cornette's own sale of a version of the FJC Shirt means that, under the equitable doctrine of unclean hands, the balance of the equities disfavors granting an injunction. (ECF No. 59 at 2.) The Court should apply the unclean hands doctrine in this case because Cornette improperly obtained the image used on the FJC Shirt in order to sell his own version of the FJC Shirt and because Cornette therefore cannot show that other vendors selling knockoff versions of the FJC Shirt did not obtain the image from his own website; the Court should not permit Cornette to complain of, and seek to enjoin, conduct in which he has engaged. (*Id.* at 3.) The Court should also deny Cornette's request for an injunction because Cornette does not own an exclusive license to the images used on the Shirts. (*Id.*) Although the evidence of record demonstrates that Cornette does not own an exclusive license to the images used for the Shirts, Cornette has repeatedly asserted that he does own such a license and the Court should therefore account for Cornette's making statements that are known to be false in determining whether an injunction is merited. (*Id.* at 3–4.)

G-Raver also argues that Cornette engages in the use of caricatures in a similar manner as G-Raver did in creating the Shirts. (*Id.* at 11.) Cornette uses thumbnail cartoon

images of people he discusses without their permission, and these thumbnail images draw viewers to Cornette's videos. (*Id.*) This conduct, the unauthorized use of the likeness of people he discusses is no different from G-Raver's use of Cornette's name and likeness on the Shirts, and Cornette should therefore not be able to enjoin conduct identical to that from which he profits. (*Id.*)

### 2. The Balance of the Equities Favors G-Raver

In balancing the equities, the Court is guided by the principle that if the harm is severe enough, even a weak claim can support an injunction; conversely, a strong enough claim can support an injunction that will not prevent a great deal of harm. *Reilly*, 858 F.3d at 179. The Court concludes that the balance of the equities in this case disfavors an injunction. The Court has determined that Cornette has failed to show either a likelihood of success on the merits or irreparable harm, meaning that an injunction would be of limited value. *See supra*, Sections VI.A, VI.B.

The Court is unpersuaded by Cornette's arguments that G-Raver cannot complain of an injunction that it brought down upon itself. Based on the evidence before the Court, the Court has concluded that G-Raver believed the Shirts were a lawful use of Cornette's name and likeness and had reasonable grounds to so believe. *See supra*, Section VI.A.3.b.ii. Accordingly, G-Raver's refusal to stop selling the Shirts as Cornette requested does not weigh in favor of granting an injunction. Further, Cornette engaged in the same conduct that he now seeks to enjoin: selling the FJC Shirt. (Tr. at 101:7–24; 145:18–24.) If the Shirts were so objectionable to Cornette, he likely would not have sold them on his website, and the fact that he did also indicates that the balance of the equities weighs

against an injunction—in this Court's view, it is inequitable to enjoin one party from the complained of conduct when the allegedly injured party engaged in the very same conduct of which he complains.

### D.  The Public Interest Disfavors an Injunction

#### 1.  The Parties' Arguments

Cornette maintains that a preliminary injunction is also in the public interest because it will prevent consumers from being deceived or confused by similarities between the Shirts and Cornette's own merchandise.  (ECF No. 57 at 19.)  The rapid proliferation of internet sales of t-shirts similar to the Shirts harms both Cornette—through his trademark rights and right of publicity—and the public—by causing confusion.  (*Id.*)  G-Raver does not specifically argue how the public interest disfavors an injunction.

#### 2.  The Public's Interest in Free Expression Outweighs Its interest in Protection of Trademarks and the Right of Publicity

In considering the public interest, the Court looks beyond simply the parties in the dispute and turns to the potential impact on the populace at large; the Court's focus is on specific "tangible effects on third parties."  *Stilp v. Contino*, 629 F. Supp. 2d 449, 467 (M.D. Pa. 2009).  Protecting First Amendment rights unquestionably serves the public interest. *McCahon v. Pa. Tpk. Comm'n*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007); *see, e.g., Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999).  However, where there is a likelihood of confusion arising from allegedly infringing use of a trademark, injunctive relief may be in the public interest.  *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992).  The Court is also cognizant of the principle that, as "a practical matter, if a

plaintiff demonstrates a likelihood of success on the merits and irreparable injury," an injunction is almost always in the public interest. *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). It stands to reason, then, that a failure to establish either of those two elements indicates that the public interest disfavors an injunction.

Here, the public interest in protecting free expression and the ability to critique ideas found objectionable outweighs the public interest in protection of trademarks and the right of publicity, particularly when the party aggrieved by alleged infringement has failed to show a likelihood of success on the merits or that irreparable harm is likely. Accordingly, the public interest disfavors an injunction.

## VII.     Conclusion

For the foregoing reasons, the Court holds that Cornette has failed to demonstrate: (1) a likelihood of success on the merits of any of his claims; (2) irreparable harm due to any alleged infringement of his trademarks or right of publicity; (3) that the balance of equities favors an injunction; and (4) that the public interest favors an injunction. Based on these conclusions, the Court holds that Cornette does not merit injunctive relief and the Court therefore denies Cornette's Motion for a preliminary injunction.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES "JIM" CORNETTE, | ) | Case No. 3:19-cv-219 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| BRANDON GRAVER, WILLIAM J. | ) | |
| MOLNAR, JR, *individually and d/b/a/* | ) | |
| THE INDY CONNECTION, and THE | ) | |
| INDY CONNECTION, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this _20th_ day of July, 2020, upon consideration of Plaintiff James
"Jim" Cornette's Motion Temporary Restraining Order (ECF No. 11), which the Court
views and analyzes as a request for a preliminary injunction, and after hearing on that
Motion (ECF No. 55), and for the reasons stated above, **IT IS HEREBY ORDERED** that
the Motion is **DENIED**.

BY THE COURT:

_____
**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**